706

PATRICK McGOVERN, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 91846.   Promulgated October 17, 1939.

*J. Marvin Haynes, Esq., Harry S. Bandler, Esq.,* and *Conrad B. Taylor, C. P. A.,* for the petitioner.

*D. Hurd Hudson, Esq.,* and *L. C. Mitchell, Esq.,* for the respondent.

710

OPINION.

HILL: The petitioner contends that the New York State franchise tax and the Federal capital stock tax incurred by it during the years 1931 through 1934 are of such a character as to be properly allocable to the water tunnel contract and that under the completed contract basis of reporting income are allowable deductions in determining the net income from the contract when completed in 1935. The respondent takes the position that said taxes are not properly allocable to any one or more particular activities of the petitioner, but, having been incurred and accrued in the years 1931 through 1934, respectively, they constituted proper deductions for the respective years in which incurred and therefore are not allowable deductions in determining the net income from the contract on the completed contract basis. There is no controversy between the parties as to the right of the petitioner to report the income from the water tunnel contract on the completed contract basis in 1935. Nor is there any controversy as to the New York State franchise tax and Federal capital stock tax constituting deductible items by petitioner. The controversy is as to the year or years in which such items were deductible.

The completed contract method of reporting income is a modification of the strict accrual method and differs from it in that items of income and expense, though recorded in primary accounts when accrued or incurred, are not carried into profit and loss as earnings of the business until the contract to which they relate is completed. A separate account is kept for each contract. Any debit balance in the account represents the investment in the contract and any credit balance represents unearned income until the contract's completion. A characteristic of the method is that income earned in one accounting period may not be accounted for until a later period. *Fort Pitt Bridge Works*, 24 B. T. A. 626; affirmed on this point, 92 Fed. (2d) 825; certiorari denied, 303 U. S. 659.

The New York State franchise tax was for the respective fiscal years begun on November 1, 1931, 1932, 1933, and 1934, and was

accruable by petitioner in its calendar years during which said fiscal years began, even though the tax was not required to be paid until as late as January 1 following the close of the calendar years. Par. 209 of the Tax Law of the State of New York; *Jamestown Worsted Mills*, 1 B. T. A. 659; *Kossar & Co.*, 16 B. T. A. 952; petition for review dismissed by the Circuit Court of Appeals for the Second Circuit, April 2, 1932. The capital stock tax for the year ended June 30, 1933, was accruable by petitioner on June 16, 1933, the date of the enactment of the National Industrial Recovery Act, which by section 215 imposed the tax. The capital stock tax imposed by the National Industrial Recovery Act for the year ended June 30, 1934, was accruable by petitioner on July 1, 1933. Cf. I. T. 2726, C. B. XII-2, p. 42. On May 10, 1934, the Revenue Act of 1934 was enacted. Section 703 (d) of that act amended the National Industrial Recovery Act so as to provide that the capital stock tax imposed by section 215 thereof should not apply to any taxpayer in respect of any year except the year ended June 30, 1933, thereby extinguishing all liability of petitioner for capital stock tax for the year ended June 30, 1934, under the National Industrial Recovery Act. Cf. I. T. 2827, C. B. XIII-2, p. 130. The provisions of section 701 of the Revenue Act of 1934 imposed a capital stock tax for the year ended June 30, 1934, and for subsequent years. Under those provisions the capital stock tax for the year ended June 30, 1934, was accruable by petitioner on May 10, 1934, and the capital stock tax for the year ended June 30, 1935, was accruable on July 1, 1934. Cf. G. C. M. 13681, C. B. XIV-1, p. 58; G. C. M. 17340, C. B. XV-2, p. 81.

Article 42-4 of Regulations 86, pertaining to the Revenue Act of 1934, provides as follows:

*Long-Term Contracts.*—Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used herein the term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon either of the following bases:

(a) Gross income derived from such contracts may be reported upon the basis of percentage of completion. In such case there should accompany the return certificates of architects or engineers showing the percentage of completion during the taxable year of the entire work to be performed under the contract. There should be deducted from such gross income all expenditures made during the taxable year on account of the contract, account being taken of the material and supplies on hand at the beginning and end of the taxable period for use in connection with the work under the contract but not yet so applied. If, upon completion of a contract, it is found that the taxable net income arising thereunder has not been clearly reflected for any year or years, the Commissioner may permit or require an amended return.

(b) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion.

\* \* \* \* \* \* \*

Were the New York State franchise tax and the Federal capital stock tax in controversy properly allocable to the water tunnel contract? The respondent has determined that they were not and the burden is upon the petitioner to show that such determination is erroneous. The New York State franchise tax was imposed on petitioner for the privilege of exercising its franchise in that state in a corporate or organized capacity and the Federal capital stock tax was imposed with respect to carrying on or doing business. The petitioner takes the position that the only business it was carrying on from 1931 through 1935 was the completion of the water tunnel contract and that therefore the taxes were allocable in their entirety to that contract under the foregoing regulations. The respondent contends that, since the New York State franchise tax was computed upon the basis of petitioner's entire net income as reported in its Federal income tax returns for the respective preceding years plus certain other income from its large holdings of securities which was nontaxable income in petitioner's Federal income tax returns, and since the petitioner had dealings in substantial volume in securities the ownership of which was not essential to the completion of the water tunnel contract, no portion of either the New York State franchise tax or the Federal capital stock tax is properly allocable to the water tunnel contract. Since the New York State franchise tax was imposed for the privilege of petitioner's exercising its franchise in that state, we think it is immaterial that the amount of that tax should be computed on or measured by income, either taxable or nontaxable, in petitioner's Federal income tax returns that did not relate to the water tunnel contract. Respondent does not contend that such tax was an income tax.

The evidence shows that if petitioner had not entered into the water tunnel contract and had had no other business, but had continued to exist and exercise its franchise in the handling of its securities and the collection of the income therefrom during the years 1931 through 1935, it would have paid the same franchise tax that it did pay. The petitioner's practice in deducting New York State franchise tax in its Federal income tax returns has not been consistent. In its returns for 1928 and 1929, when it was reporting income on the completed contract basis, as in later years it took deductions for

the franchise tax but reported no income from completed contracts. The evidence further shows that at the end of 1930 there was outstanding against the petitioner a large number of property damage claims which had arisen from the construction of the subway, which was completed in that year, and that the disposition of those claims required a great deal of time, effort, and expense in later years. The evidence further indicates that possibly some of the claims are still pending. In addition, the petitioner's Federal income tax returns for the years 1931 through 1935 show that it took deductions during that period totaling approximately $100,000 as costs of contracts completed in prior years. What portion, if any, of such amount represented payments in settlement of subway damage claims we do not know. It may well be that such expenditures were made for repairs to and the servicing of construction jobs which it had done in years prior to 1931 and for which it was liable under the contracts for those jobs.

At the end of the indicated years the petitioner owned Federal, state, municipal, and corporate securities as follows, of which the indicated amounts were on deposit with the New York City and/or with the State of New York in connection with the percentages retainable by the city under contracts and/or in connection with the petitioner's self-insurance under the Workmen's Compensation Law of New York State, and from which petitioner received income as indicated:

|  | Security holdings | Amount of securities on deposit | Income received from securities |
|---|---|---|---|
| 1929 | $7,601,096.13 | Not shown | $357,431.87 |
| 1930 | 8,314,171.17 | $2,392,000.00 | 338,086.52 |
| 1931 | 13,308,639.47 | 2,729,000.00 | 375,610.35 |
| 1932 | 7,873,215.47 | 2,834,000.00 | 420,694.78 |
| 1933 | 8,247,398.87 | 2,035,050.00 | 337,543.48 |
| 1934 | 4,465,630.90 | 1,585,050.00 | 243,253.28 |
| 1935 | 3,751,699.65 | 1,350,350.00 | 156,857.46 |

The petitioner points to the fact that the completion of the tunnel was a large, hazardous undertaking and contends that this made it necessary that it have substantial financial reserves and further that the requirements respecting its self-insurance and obtaining payment of the retainable percentage of current monthly estimates made necessary the deposit of substantial amounts of securities. It urges that its securities were only working capital used in the performance of the water tunnel contract and that their handling and management did not constitute a business activity separate and apart from the performance of the water tunnel contract. The amount of the securities on deposit with the city and with the State of New York was only a fractional part, ranging from approximately one-fifth to one-

third, of those owned by petitioner at the end of the respective years 1930 through 1935. So far as the record shows, the deposit of securities was not necessary to the performance of the water tunnel contract, but, by making deposit of them as it did, petitioner was enabled to receive the interest on substantial sums of money which otherwise would have been tied up on the contract, with no interest receivable therefrom. While the evidence shows that in 1932 the city was having difficulty in selling its bonds and was not able currently to make payment of the monthly estimates, thus making it necessary that the petitioner use other of its funds in the carrying out of the contract, that fact does not appear to have affected the amount of petitioner's security holdings. Between the end of 1931 and 1932 those holdings decreased by $5,435,424, which was approximately $640,000 less than the amount distributed by petitioner to its stockholders during that time. Furthermore, between the end of 1932 and the end of 1933 the petitioner's holdings of securities increased approximately $375,000. The balance sheets accompanying petitioner's Federal income tax returns for the years 1930 through 1934 show that at the end of all years during that period petitioner's holdings of Federal, state, municipal and corporate securities were well in excess of one-half of its total assets and at the end of 1931 such holdings were in excess of two-thirds of its total assets. While we are not informed as to the various activities that petitioner's charter authorized it to engage in, the evidence would indicate that the purchase, sale, and holding of securities and the receiving of the income therefrom must have been one. In view of this and of the petitioner's activities with respect to other prior contracts, we do not think that the petitioner has established that the only business it was engaged in from 1931 through 1934 was the performance of the water tunnel contract. Pertinent to the situation here is the following statement from *Argonaut Consolidated Mining Co.* v. *Anderson*, 52 Fed. (2d) 55:

Just what activities bring a corporation within the statutory definition the decisions, as is almost inevitable, do not certainly declare. That there is a degree of quietude which will exempt it, is indeed well settled. (*Zonna* v. *Minneapolis Syndicate*, 220 U. S. 187, 31 S. Ct. 361, 55 L. Ed. 428; *McCoach* v. *Minehill, etc. Co.* 228 U. S. 295, 33 S. Ct. 419, 57 L. Ed. 842; *U. S.* v. *Emery, etc. Co.*, 237 U. S. 28, 35 S. Ct. 499, 59 L. Ed. 825; *Eaton* v. *Phoenix Securities Co.*, 22 F. (2d) 497, (CCA 2); *Rose* v. *Nunnally Co.*, 22 F. (2d) 102 (CCA 3)); but how far it may be active and still maintain its exemption, is in the nature of things impossible of statement in general terms. In most of those cases in which the corporation has succeeded its activities have been confined to holding the title of property, whose usufruct it receives and distributes in dividends. When this is the whole scope of its dealings, it does no business within the meaning of the statute.

However, it takes little to bring it from behind this shield. * * *

In *Harmar Coal Co.* v. *Heiner*, 34 Fed. (2d) 725, the test was stated as follows:

\* \* \* when a corporation is organized for one definite purpose, the ultimate object of which is profits, and it engages in the business of effectuating that purpose and then stops the business by reason of sale, lease, or other action, and thereafter simply hangs on, in a corporate sense, receiving and distributing the avails of its re-organized affairs, it is not doing business. On the other hand a corporation, organized for a definite though limited business purpose involving profits, that pursues activities to carry out that purpose, no matter how few or small they may be, is carrying on or doing business within the meaning of the statute. \* \* \*

Since the petitioner has not shown that its only business during the years 1931 through 1934 was the performance of the water tunnel contract and since the New York State franchise tax and Federal capital stock tax in controversy related to all of petitioner's activities and not solely to its work on the water tunnel, the entire amount of such taxes is not properly allocable to the water tunnel contract. These taxes having accrued in years prior to 1935, only such portion of them as is allocable to the water tunnel contract may be brought forward and deducted in 1935. The portion allocable to petitioner's remaining activities, however, may not be so brought forward. Cf. *Norton Construction Co.*, 21 B. T. A. 443.

Apparently for the purpose of showing how, in accordance with good accounting practice, the franchise and the capital stock taxes in controversy should be allocated, if it should be determined that petitioner's work on the water tunnel during 1931 through 1934 did not constitute its sole business activity, the petitioner submitted the opinion testimony of two reputable certified public accountants. In substance their testimony is that where a corporation is engaged in two types of business activity, the franchise and the capital stock taxes paid by it should be apportioned between the kinds of business activity on the basis of the proportion that the net income resulting from each activity bears to the total net income from both activities. On the record before us we think such a method of apportioning the franchise and the capital stock taxes in controversy between the water tunnel contract, on the one hand, and the petitioner's other activities on the other, is fair and reasonable and properly applicable here. We hold, therefore, that there should be such apportionment.

The remaining issue is as to the correctness of the respondent's action in determining the excess profits tax exemption to which petitioner was entitled at $200,802.68, or 12½ percent of $1,606,421.47, the value declared by petitioner for its capital stock in its capital stock tax return for the year ended June 30, 1935. The petitioner's position is that, since in its 1935 Federal income tax return it reported the entire income from the water tunnel contract earned over

the seven-year period from 1929 to 1935, its excess profits tax exemption for 1935 likewise should be determined on the value of its capital stock for the seven-year period. By multiplying $8,000,000, the value declared for its capital stock in its capital stock tax returns for the years ended June 30, 1933 and 1934, by seven, representing the number of years involved in completing the contract, from that product subtracting $6,496,000, representing the distributions in liquidation made in 1934, and taking 12½ percent of the remainder, the petitioner computes the excess profits tax exemption at the amount of $6,188,000, which it contends is the proper amount.

Respecting capital stock and excess profits taxes, the Revenue Act of 1934 provides as follows:

SEC. 701. CAPITAL STOCK TAX.

(a) For each year ending June 30, beginning with the year ending June 30, 1934, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock.

    \*        \*        \*        \*        \*        \*        \*

(f) For the first year ending June 30 in respect of which a tax is imposed by this section upon any corporation, the adjusted declared value shall be the value, as declared by the corporation in its first return under this section (which declaration of value cannot be amended), as of the close of its last income-tax taxable year ending at or prior to the close of the year for which the tax is imposed by this section (or as of the date of organization in the case of a corporation having no income-tax taxable year ending at or prior to the close of the year for which the tax is imposed by this section). For any subsequent year ending June 30, the adjusted declared value in the case of a domestic corporation shall be the original declared value plus (1) the cash and fair market value of property paid in for stock or shares, (2) paid in surplus and contributions to capital, (3) its net income, (4) the excess of its income wholly exempt from the taxes imposed by Title I over the amount disallowed as a deduction by section 24 (a) (5) of such title, and (5) the amount of the dividend deduction allowable for income tax purposes, and minus (A) the value of property distributed in liquidation to shareholders, (B) distributions of earnings or profits, and (C) the excess of the deductions allowable for income tax purposes over its gross income, adjustment being made for each income-tax taxable year included in the period from the date as of which the original declared value was declared to the close of its last income-tax taxable year ending at or prior to the close of the year for, which the tax is imposed by this section. The amount of such adjustment for each such year shall be computed (on the basis of a separate return) according to the income tax law applicable to such year. \* \* \*

SEC. 702. EXCESS-PROFITS TAX.

(a) There is hereby imposed upon the net income of every corporation, for each income-tax taxable year ending after the close of the first year in respect of which it is taxable under section 701, an excess-profits tax equivalent to 5 per centum of such portion of its net income for such income-tax taxable year as is in excess of 12½ per centum of the adjusted declared value of its capital stock \* \* \* as of the close of the preceding income-tax taxable year (or as of the date of organization if it had no preceding income-tax taxable year) determined

as provided in section 701. If the income-tax taxable year in respect of which the tax under this section is imposed is a period of less than 12 months, such adjusted declared value shall be reduced to an amount which bears the same ratio thereto as the number of months in the period bears to 12 months. For the purposes of this section the net income shall be the same as the net income for income tax purposes for the year in respect of which the tax under this section is imposed.

(b) All provisions of law (including penalties) applicable in respect of the taxes imposed by Title I of this Act, shall, insofar as not inconsistent with this section, be applicable in respect of the tax imposed by this section, except that the provisions of section 131 of that title shall not be applicable.

The petitioner argues that if the capital of a corporation reporting income for a period of less than 12 months is to be reduced to an amount which bears the same ratio thereto as the number of months in the period bears to 12 months, as provided in section 702 (a), then the capital in the case of a corporation reporting income earned over a period greater than 12 months is to be increased in a corresponding ratio. Although the act contains no specific provision which upholds the petitioner's conclusion, it urges that such was the intention of Congress and points to certain statements contained in the report of the Committee on Finance of the Senate (Senate Report No. 558) in reporting the Revenue Act of 1934 to the Senate and in the Conference Report (No. 1385) to the House on the act, to the effect that the primary purpose of the excess profits tax was to induce corporations automatically to declare a fair value for their corporate stock for capital stock tax purposes and the secondary purpose was to subject to a somewhat higher rate of tax abnormal profits which are out of proportion to the capital of the corporation. Conceding that such were the purposes of Congress in enacting the excess profits tax provisions of the act, we are unable to find anything in such statements or in the act itself indicating that to effect those purposes it was the intention of Congress to go to such a length as the petitioner requests here and pyramid capital stock values for a period of seven years. While in section 702 (a) Congress definitely has provided that, in cases where the income tax taxable year in respect of which the excess profits tax is imposed is a period of less than 12 months, the declared value of the capital stock shall be reduced to the proportion that the number of months in such taxable period bears to 12 months, it has failed to provide that the capital is to be increased in a corresponding ratio in cases where the income reported was earned over a period greater than 12 months. Congress having failed to make such provision in the act, we are without authority to supply the omission, graft on something that is not there, and allow the petitioner's contention. *Iselin* v. *United States,* 270 U. S. 245; *Smietanka* v. *First Trust & Savings Bank,* 257 U. S. 602.

The petitioner urges that, if we find that the act does not authorize the allowance of its contention, then we must find that the act is unconstitutional as being violative of the Fifth Amendment, because it imposes a tax that is arbitrary, unreasonable, and capricious. For reasons satisfactory to itself the petitioner at the beginning of its existence elected to report its income from long term contracts on the completed contract basis. Under that method no income received from such contracts was reported and taxed until the completion of the contracts even though, as in the case of the water tunnel contract, several years elapsed between receipt of a substantial portion of the income from the contract and the year in which such income was subjected to tax. Conceivably the receipt and use of such income for several years prior to its taxation might be an advantage enjoyed by petitioner over other taxpayers who were currently reporting income from long term contracts as accrued or received. It may well be that it was for this reason that Congress failed to provide that the excess profits tax exemption in the case of corporations reporting income on the completed contract basis should be computed on the pyramided capital of such corporations during the period they were engaged on the long term contracts. The distributions in liquidation made by petitioner in 1934, the year prior to the completion of the contract and the reporting of the income therefrom, contributed very materially to the reduction of petitioner's capital, thereby reducing the excess profits tax exemption and consequently increasing the amount of its excess profits tax in 1935. Where a taxpayer voluntarily chooses his own course of action, he may not thereafter avoid its results. Cf. *Pacific National Co.* v. *Welch*, 304 U. S. 191; *Chicago Telephone Supply Co.* v. *United States*, 23 Fed. Supp. 471; certiorari denied, 305 U. S. 628.

We fail to see that the act, by providing that the amount of the petitioner's excess profits tax exemption be computed in the manner employed herein by the respondent, results in an arbitrary and capricious confiscation of the petitioner's property or is otherwise in violation of the Fifth Amendment.

Finding no error in the respondent's determination of the amount of petitioner's excess profits tax exemption, his determination of such exemption is approved. However, our decision as to the deductibility of an allocable portion of the New York State franchise tax and the Federal capital stock tax will result in a reduction of the amounts of the deficiencies determined by respondent as to both the income tax and the excess profits tax.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Sternhagen dissents.

LEECH, dissenting on the first issue: It seems to me petitioner has established that the only business in which it was engaged from 1931 through 1934 was the performance of the water tunnel contract. Therefore, I think, the state franchise tax and Federal capital stock tax, for such years, are allocable, in their entirety, to 1935, the year in which the water tunnel long term contract was completed.