McCOACH, COLLECTOR OF INTERNAL REV-
ENUE, v. MINEHILL & SCHUYLKILL HAVEN
RAILROAD COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
THIRD CIRCUIT.

No. 670.   Argued January 14, 15, 1913.—Decided April 7, 1913.

The corporation tax is imposed upon the doing of corporate business
and with respect to the carrying on thereof and not upon the fran-
chises or property of the corporation irrespective of their use in
business. *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 145.

A railway corporation which has leased its railroad to another company
operating it exclusively but which maintains its corporate existence
and collects and distributes to its stockholders the rental from the
lessee and also dividends from investments is not doing business
within the meaning of the Corporation Tax Act. *Park Realty Com-
pany Case sub Flint* v. *Stone Tracy Co.*, 220 U. S. 171, distinguished,
and *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, followed.

*Quære* whether such a corporation would be subject to the tax if it
exercised the power of eminent domain or other corporate powers
for the benefit of the lessee.

192 Fed. Rep. 670, affirmed.

THE facts, which involve the construction of the pro-
visions of the Corporation Tax Act as to what constitutes
doing business by a corporation so as to subject it to the
tax, are stated in the opinion.

*Mr. Solicitor General Bullitt* for petitioner:

The Minehill Company was "engaged in business" and
was therefore subject to the Federal corporation tax.

The Corporation Tax Law is intended to tax the privi-
lege of doing business with the advantages of corporate
organization. Section 38, act of August 5, 1909; *Flint* v.
*Stone Tracy Co.*, 220 U. S. 107, 145, 146, 151, 171.

The business engaged in, done, and carried on by the
Minehill Company includes stockholders' meetings, elec-
tion of officers, etc.; declaration of dividends, corporate

reports, etc.; collection of rentals, revenue, dividends, interest, and management of finances and invested funds; payment of taxes; maintenance of offices, clerical force, etc.; preservation of corporate franchises, existence, etc. *Arrowsmith* v. *Nashville &c. R. R. Co.*, 57 Fed. Rep. 165; *Lewis, Receivers, &c.* v. *G., N. & P. R. R. Co.*, 16 Phila. 608; *P. R. R. Co.* v. *Sly*, 65 Pa. St. 205; *Snyder* v. *B. & O. R. R. Co.*, 210 Pa. St. 500; Elliott on Railroads, par. 461, note 91; 3 Thompson on Corporations, § 2516.

The foregoing activities constitute a "doing of business" within the meaning of the Corporation Tax Law. They involve continuity of business without interruption by death or dissolution; transfer of property interests by the disposition of shares of stock; advantages of business, controlled and managed by corporate directors; general absence of individual liability; keeping alive corporate existence; investment and reinvestment of surplus assets.

The present case is controlled by the various real estate cases of *Cedar Street Co.* v. *Park Realty Co.; Lacroix* v. *Motor Taximeter Cab Co.; Mitchell* v. *Clark Iron Co.*, all decided in *Flint* v. *Stone Tracy Co.*, 220 U. S. 107; and it is not controlled by *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187. There are decided points of difference between the Minehill Co. and the Minneapolis Syndicate.

The lower courts erred in assuming that the Reading Railway was paying taxes upon the $252,612 rental, whereas in fact the Reading Railway was allowed to deduct that amount from its gross profits in determining the net profit upon which it should pay taxes.

*Mr. George Wharton Pepper*, with whom *Mr. Wm. B. Bodine, Jr.*, and *Mr. Eli Kirk Price* were on the brief, for respondent.

*Mr. E. Parmalee Prentice*, *Mr. George Welwood Murray* and *Mr. Charles P. Howland*, by leave of the court, filed a brief as *amici curiæ*.

MR. JUSTICE PITNEY delivered the opinion of the court.

The Minehill & Schuylkill Haven Railroad Co., the respondent herein (called for convenience the Minehill Company), sued the petitioner, who is Collector of Internal Revenue at Philadelphia, to recover certain taxes for the years 1909 and 1910 paid under protest by that company under the Corporation Tax Act of 1909. The United States Circuit Court held that the company was not "engaged in business" within the meaning of the act, and that therefore the taxes had been illegally assessed, and rendered judgment for their recovery. 192 Fed. Rep. 670. The Circuit Court of Appeals affirmed the judgment, and the case comes here upon certiorari.

The facts appear from the plaintiff's statement of claim and the defendant's affidavit of defense, which latter was overruled as insufficient. They may be summarized as follows: The Minehill Company was incorporated by an act of the legislature of the State of Pennsylvania, approved March 24, 1828 (P. L., p. 205), for the purpose of constructing and operating a railroad, with appropriate powers, including the power of eminent domain. Under this charter a railroad was built and for many years operated. Under the authority of general acts of the legislature, approved respectively April 23, 1861 (P. L., p. 410), and February 17, 1870 (P. L., p. 31), the Minehill Company, in the year 1896, leased its entire railroad, with all side-tracks, extensions, and appurtenances of every kind, and all rolling stock and personal property of every description in use or adapted for use in, upon, or about the railroad (excepting some property intended to have been described in a schedule annexed to the lease, but which is not described, no such schedule having been annexed), and also—"All the rights, powers, franchises (other than the franchise of being a corporation), and privileges which may now, or at any time

hereafter during the time hereby demised, be lawfully
exercised or enjoyed in or about the use, management,
maintenance, renewal, extension, alteration, or improve-
ment of the demised premises, or any of them," unto the
Philadelphia & Reading Railway Company for a term of
nine hundred and ninety-nine years from January 1, 1897,
at a yearly rental of $252,612, that being equivalent to six
per centum upon the capital stock of the Minehill Com-
pany.

The lessee agreed to keep the road in good order and
repair, keep it in public use and efficiently operate it, and
return it to the lessor company at the expiration or other
determination of the lease. The Minehill Company agreed
during the term of the lease to maintain its corporate
existence and organization, and that when requested by
the lessee it would "put in force and exercise each and
every corporate power, and do each and every corporate
act which the Minehill Company might now, or at any
time hereafter, lawfully put in force or exercise, to enable
the Railway Company (the lessee) to enjoy, avail itself of,
and exercise, every right, franchise, and privilege in re-
spect of the use, management, maintenance, renewal, ex-
tension, etc., of the property demised, and of the business
to be there carried on." It was provided that upon default
in the payment of the rent reserved, or in the performance
of certain other covenants, the lessor might declare the
lease forfeited and reënter and repossess the demised
premises. The lease further provided that the lessee
might, under certain circumstances, abandon certain rail-
way lines, "whenever it shall be found legally practicable
to abandon so much of the said lines of railroad, without
working a forfeiture or any impairment of the chartered
rights and franchises of the Minehill Company as to its
railroads, or any part thereof, or without creating any
liability on the part of the Minehill Company or the Rail-
way Company, to the public or the Commonwealth, for

the non-user of such portions of the railroad lines." In the event thus provided for the abandoned rails, machinery, etc., are to be sold and the proceeds turned over to the Minehill Company, and the annual rental proportionately reduced.

Pursuant to this lease the entire railroad and all property connected therewith was turned over to the Reading Company, and since then has been operated by that company, and the Minehill Company has not carried on any business in connection with the operation of it. It has, however, maintained its corporate existence and organization by the annual election of a president and board of managers, and this board has annually elected a secretary and treasurer. It receives annually from the Reading Company the fixed rental called for by the lease, and it receives annually sums of money as interest on its bank deposits, and also maintains a "contingent fund," from which it receives annual sums as interest or dividends. And it annually pays the ordinary and necessary expenses of maintaining its office and keeping up the activities of its corporate existence, including the payment of salaries to its officers and clerks. It keeps and maintains at its offices, stock books for the transfer of its capital stock, and this stock is bought and sold upon the market. The annual income from the contingent fund appears to be about $24,000, its annual payments for state taxes about as much, and its expenditures for corporate maintenance about $5,000.

The Corporation Tax Law (act of August 5, 1909, § 38; 36 Stat., c. 6, pp. 11, 112–117), provides:

"That every corporation . . . organized for profit and having a capital stock represented by shares . . . and engaged in business in any state . . . shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation . . . equivalent to one per centum upon the

entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations . . . subject to the tax hereby imposed. . . .

"Such net income shall be ascertained by deducting from the gross amount of the income of such corporation, . . . received within the year from all sources, (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, including all charges such as rentals or franchise payments, required to be made as a condition to the continued use or possession of property; (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, . . ."

In *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, the question of the constitutionality of this act was presented here for decision. Upon the preliminary question of interpretation the court said (pp. 145, 146):

"It is therefore apparent, giving all the words of the statute effect, that the tax is imposed not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business and with respect to the carrying on thereof, in a sum equivalent to one per centum upon the entire net income over and above $5,000 received from all sources during the year; that is, when imposed in this manner it is a tax upon the doing of business with the advantages which inhere in the peculiarities of corporate or joint stock organizations of the character described. As the latter organizations share many benefits of corporate organization it may be described generally as a tax upon the doing of business in a corporate capacity. . . . The income is not limited

to such as is received from property used in the business, strictly speaking, but is expressly declared to be upon the entire net income above $5,000 from all sources, excluding the amounts received as dividends on stock in other corporations, joint stock companies or associations, or insurance companies also subject to the tax. In other words, the tax is imposed upon the doing of business of the character described, and the measure of the tax is to be the income, with the deduction stated, received not only from property used in business, but from every source."

In discussing the constitutional question, reference was first made to the case of *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 158 U. S. 601, which held the income tax provisions of the act of August 27, 1894 (28 Stat., c. 349, pp. 509, 553, § 27, etc.), to be unconstitutional because amounting to a direct tax within the meaning of the Constitution, and because not apportioned according to population as required by that instrument. Attention was called (220 U. S. 148) to the expressions used by Mr. Chief Justice Fuller, speaking for the court in the *Pollock Case*, upon the rehearing, as to the distinction between a tax upon the income derived from real estate and from invested personal property, on the one hand, and an excise tax upon business privileges, employments, and vocations, upon the other: Reference was also made to the interpretation put upon the decision in the *Pollock Case* in *Knowlton* v. *Moore*, 178 U. S. 41, 80, and in *Spreckels Sugar Refining Co.* v. *McClain*, 192 U. S. 397, and it was held (p. 150) that the corporation tax law of 1909 "does not impose direct taxation upon property solely because of its ownership, but the tax is within the class which Congress is authorized to lay and collect under Art. I, § 8, cl. 1 of the Constitution, and described generally as taxes, duties, imposts and excises, upon which the limitation is that they shall be uniform throughout the United States."

In applying this principle to the several cases then *sub judice*—in some of which the validity of the tax was challenged by the stockholders of certain real estate companies whose business was principally the holding and management of real estate—the court dealt, among others (220 U. S. 170), with the Park Realty Co., organized to "work, develop, sell, convey, mortgage or otherwise dispose of real estate; to lease, exchange, hire or otherwise acquire property; to erect, alter or improve buildings; to conduct, operate, manage or lease hotels, apartment houses, etc.; to make and carry out contracts in the manner specified concerning buildings . . . and generally to deal in, sell, lease, exchange or otherwise deal with lands, buildings and other property, real or personal," etc. At the time the bill was filed in that case the business of the Park Realty Company related only to the management and leasing of one hotel. Others of the realty companies that were before the court were engaged in more extensive business transactions. The court held (p. 171):

"We think it is clear that corporations organized for the purpose of doing business, and actually engaged in such activities as leasing property, collecting rents, managing office buildings, making investments of profits, or leasing ore lands and collecting royalties, managing wharves, dividing profits, and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law."

Another case argued and decided at the same time, but separately reported, is *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187. In this case the court held that the corporation was not doing business in such wise as to make it subject to the tax imposed by the act of 1909, because while originally organized for and engaged in the business of letting stores and offices in a building owned by it, and collecting and receiving rents therefor, it had afterwards

made a lease of all lands belonging to it to certain trustees for a term of 130 years, and then had caused its articles of incorporation, which had been those of a corporation organized for profit, to be so amended as to confine the purpose of the corporation to the ownership of the lands in question, subject to the lease, and "for the convenience of its stockholders to receive, and to distribute among them, from time to time, the rentals that accrue, under said lease, and the proceeds of any disposition of said land." The court said (p. 190):

"The corporation involved in the present case, as originally organized and owning and renting an office building, was doing business within the meaning of the statute as we have construed it. Upon the record now presented we are of opinion that the Minneapolis Syndicate, after the demise of the property and reorganization of the corporation, was not engaged in doing business within the meaning of the act. It had wholly parted with control and management of the property; its sole authority was to hold the title subject to the lease for 130 years, to receive and distribute the rentals which might accrue under the terms of the lease, or the proceeds of any sale of the land if it should be sold. The corporation had practically gone out of business in connection with the property and had disqualified itself by the terms of reorganization from any activity in respect to it."

The precise question presented by the present record is whether the Minehill Company is "doing business" in the sense in which the realty companies concerned in *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 170, were doing business, or had gone out of business in substantially the same sense that the Minneapolis Syndicate had done so.

From the facts as stated above it is entirely clear that the Minehill Company was not, during the years of 1909 and 1910, engaged at all in the business of maintaining or operating a railroad, which was the prime object of its

incorporation. This business, by the lease of 1896, it had
turned over to the Reading Company. If that. lease had
been made without authorization of law, it may be that
for some purposes, and possibly for the present purpose,
the lessee might be deemed in law the agent of the lessor;
or at least the lessor held estopped to deny such agency.
But the lease was made by the express authority of the
State that created the Minehill Company, conferred upon
it its franchise, and imposed upon it the correlative pub-
lic duties. The effect of this legislation and of the lease
made thereunder was to constitute the Reading Com-
pany the public agent for the operation of the railroad and
to prevent the Minehill Company from carrying on busi-
ness in respect of the maintenance and operation of the
railroad so long as the lease shall continue. And it is the
Reading Company, and not the Minehill Company, that
is "doing business" as a railroad company upon the lines
covered by the lease and is taxable because of it. The
Corporation Tax Law does not contemplate double taxa-
tion in respect of the same business.

The Government points out that by the terms of the
act the Reading Company is allowed to deduct from its
gross income the $252,612 paid annually to the Minehill
Company for rentals under the lease, with the result that,
unless the latter company is held to be "doing business"
as a railroad company, both lessor and lessee entirely es-
cape from taxation on $252,612 of income. But an ex-
amination of the act shows that this is the precise result
intended by Congress. "Net income shall be ascertained
by deducting from the gross amount of the income . . .
(first) all the ordinary and necessary expenses actually
paid within the year out of income in the maintenance
and operation of its business and properties, *including all
charges such as rentals or franchise payments*, required to be
made as a condition to the continued use or possession
of the property." The deduction of rentals is not confined

to such as are paid to companies that are subject to the tax imposed by the act; and yet the suggestion that it might be so confined was present in the mind of the draftsman, for below there is a provision for deducting "(fifth) all amounts received . . . as dividends upon stock of other corporations . . . . *subject to the tax hereby imposed.*" In short, Congress said, and intended to say, as to rentals paid for the use or possession of property and franchises employed by the lessee company in a business taxable under the act,—Let there be a deduction by the lessee of the amount of such rentals, whether the lessor is within the reach of the taxing scheme or not.

We conclude that the Minehill Company was not taxable with respect to the railroad business.

It should be mentioned that there is nothing in the record to show that during the taxing years in question the company exercised its power of eminent domain, or put in force any other special corporate power, in aid of the business of the lessee. We therefore do not pass upon the question whether, if it should do so, it would be taxable under the act in question. We cannot, however, agree with the contention made in behalf of the Government that because the Minehill Company retains its franchise of corporate existence, maintains its organization, and holds itself ready to exercise its franchise of eminent domain, or other reserved powers, if and when required by the lessee, and ready to resume possession of the property at the expiration of the lease, it is therefore to be treated as doing business, in respect of the railroad, within the meaning of the Corporation Tax Law. As to these matters the case is governed by what was said by the court in *Flint* v. *Stone Tracy Co.*, 220 U. S. 145,—"It is therefore apparent, giving all the words of the statute effect, that the tax is imposed not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or

insurance business and with respect to the carrying on thereof." And again, p. 150,—"The tax is not payable unless there be a carrying on or doing of business in the designated capacity, and this is made the occasion for the tax, measured by the standard prescribed."

There remains to be considered the fact that the Minehill Company has a considerable amount of personal assets known as its "contingent fund," in the form of investments (the amount and particulars are not specified), from which it derives an annual income of about $24,000; that it keeps a deposit in bank, receives and collects interest upon such deposit, and distributes the income thus received, as well as the rentals received from the Reading Company (after payment of expenses and taxes), to its stockholders in the form of dividends.

In our opinion the mere receipt of income from the property leased (the property being used in business by the lessee and not by the lessor) and the receipt of interest and dividends from invested funds, bank balances, and the like, and the distribution thereof among the stockholders of the Minehill Company, amount to no more than receiving the ordinary fruits that arise from the ownership of property. The ground of the decision in the *Pollock Case* was that a tax upon income received from real estate and invested personal property (as distinguished from income received from the transaction of business) was in effect a direct tax upon the property itself, and therefore invalid unless apportioned according to population. In the *Flint Case*, in sustaining the act of 1909 as a tax upon the privilege of doing business in corporate form, against the objection that it includes within its reach the income of real estate and personal property not used in the business and not the subject of taxation, the court said (220 U. S. 163): "The measure of such tax may be the income from the property of the corporation, although a part of such income is derived from property in itself non-taxable."

And again, after referring to previous decisions (220 U. S. 165): "It is therefore well settled by the decisions of this court that when the sovereign authority has exercised the right to tax a legitimate subject of taxation as an exercise of a franchise or privilege, it is no objection that the measure of taxation is found in the income produced in part from property which of itself considered is nontaxable. Applying that doctrine to this case, the measure of taxation being the income of the corporation from all sources, as that is but the measure of a privilege tax within the lawful authority of Congress to impose, it is no valid objection that this measure includes, in part at least, property which as such could not be directly taxed. . . . The tax must be measured by some standard, and none can be chosen which will operate with absolute justice and equality upon all corporations. Some corporations do a large business upon a small amount of capital; others with a small business may have a large capital. A tax upon the amount of business done might operate as unequally as a measure of excise as it is alleged the measure of income from all sources does. Nor can it be justly said that investments have no real relation to the business transacted by a corporation. The possession of large assets is a business advantage of great value; it may give credit which will result in more economical business methods; it may give a standing which shall facilitate purchases; it may enable the corporation to enlarge the field of its activities and in many ways give it business standing and prestige."

In short, the inclusion of income derived from property in arriving at the measure of the tax to be imposed with respect to the doing of corporate business was sustained largely because the property not used in the business, and the income from such property, have a fair relation to the business itself, and may contribute materially to its proper and economical conduct. But that reasoning furnishes

no support for the contention that the mere receipt of income from property, and the payment of organization and administration expenses incidental to the receipt and distribution thereof, constitute such a business as is taxable within the meaning of the act of 1909.    The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business; in which event the investment-income may be added to the business-income in order to arrive at the measure of the tax, and (b) the receipt of income from property or investments by a company that is not engaged in business except the business of owning the property, maintaining the investments, collecting the income and dividing it among its stockholders.    In the former case the tax is payable; in the latter not.

And so, upon the whole, we think the court below correctly held that the present case is governed by *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, and that the taxes under consideration were unlawfully imposed.

*Judgment affirmed.*


MR. JUSTICE DAY, with whom concur MR. JUSTICE HUGHES and MR. JUSTICE LAMAR, dissenting.

I am unable to concur in the opinion of the majority of the court.    It seems to me that, applying the principles laid down in the *Corporation Tax Cases*, 220 U. S. 107, the Minehill & Schuylkill Haven Railroad Company is a corporation doing business within the meaning of the law and subject to the tax.

We are advised by a brief filed by an *amicus curiæ* that the decision in this case will affect a number of cases now pending, and, owing to its importance as affecting the public revenue, I feel justified in briefly stating the grounds of my dissent.

The corporation tax is imposed under the terms of the

law upon every corporation organized for profit, having a capital stock represented by shares and engaged in business in any State. Every such corporation is subject to a special excise tax with respect to the carrying on or doing of business, equivalent to one per cent. upon the entire net income over and above $5,000 received by it from all sources during the taxing year. This tax, it was held in 220 U. S., was constitutionally imposed, and rests upon the doing of business with the advantages which inhere in the peculiarities of corporate or joint stock organization. As was said in that case, doing business is a very comprehensive term, embracing about everything in which a person can be employed, and the definition of business as "that which occupies the time, attention and labor of men for the purpose of a livelihood or profit" was adopted and approved. As is said in the majority opinion, the precise question in this case is, Was the Minehill Company doing business in the sense in which the term is employed in the law or had it gone out of business in such substantial sense that it was no longer subject to the law?

I do not care to restate the facts which are developed fully in the majority opinion. It therein appears that the Minehill Company, while it has leased its railroad for a term of years, still maintains corporate organization, keeps an office and an office force and collects the rentals from the lessee company and distributes the sums among its shareholders. It has also agreed to keep up its corporate organization, and, if necessary, to use its corporate powers for the benefit of the lessee. And its activities do not stop here. The affidavit in defense filed by the collector, which I understand the Pennsylvania practice takes as true, shows that the company receives annually sums of money as interest on deposits and maintains a contingent fund from which it also receives annual sums as dividends. The return discloses that the amount of dividends re-

ceived for the year ending December 31, 1909, as interest on deposits and from its contingent fund was $24,471.07. The nature and amount of the investments are not specified in the record, but they must be very considerable, in view of the annual income derived.

We are therefore brought to the direct question, Is a live corporation which, though it has leased its railroad property for a term of years, maintains and has agreed to maintain its corporate organization, collects and distributes an annual rental of $252,612, keeps and maintains an office and an office force at large expense, deposits money upon interest and receives and distributes the earnings thereof, invests a large fund which, together with interest on deposits, yields over $24,000 a year, doing business within the meaning of the Corporation Tax Act? The amount of business done is utterly immaterial. The doing of any business with the advantages which inhere in corporate organization brings the corporation within the terms of the act. Such was the ruling in the *Flint Case*, after full consideration by this court of the terms and scope of the law.

It is said, however, that this case is controlled by the ruling in the *Zonne Case*, which was decided at the same time as the *Flint Case*, 220 U. S. 187. It seems to me that the present case is quite unlike that one. There the corporation which owned a piece of real estate had leased it for a term of 130 years at an annual rental of $61,000 and had at the same time amended its corporate organization so as to limit its powers to the sole purpose of holding the title to the lands leased and of receiving and distributing among its stockholders the rentals that accrued under the lease and the proceeds from any disposition of the land. This was the whole extent of its activity, and the amounts derived therefrom represented its entire income. In that case the court held that the corporation had practically gone out of business and had disqualified

itself from any activity in respect thereof, and therefore did not come within the scope of the act.

In the present case the corporation has not disqualified itself from business activity. It maintains a considerable force in active employment and, entirely apart from the receipts from the railroad lease, so deposits and invests its funds as to create, in these days of low interest upon good investments, an annual income of over $24,000, as appears by its return. The amount derived from investments depends upon the exercise of judgment and the efficiency of management. If business includes everything that occupies the time, attention and labor of men for profit, it seems to me that these facts show that the Minehill Company is carrying on business in the present instance.

I am unable to agree that a corporation whose officers and agents are engaged in its behalf in selecting banks in which to deposit large sums of money, in passing upon and choosing securities in which corporate funds are to be invested, and then in distributing the interest and profits accruing therefrom among its stockholders, is not engaged in doing business in the sense that the corporation in the *Zonne Case* was not.

I think the present case is much nearer the ruling made by this court in the *Corporation Tax Cases* in the matter of the realty companies therein involved. Take, for instance, the Park Realty Company. That corporation was organized to work, develop, sell and convey real estate; to lease, exchange, hire or otherwise acquire property; to erect, alter or improve buildings; to conduct, operate, manage or lease hotels, etc. It appeared that at the time of the imposition of the tax the sole business or property owned by the Realty Company was the Hotel Leonori. It was leased for 21 years at an annual rental of $55,000. The corporation was engaged in no business, except the management and lease of that hotel property;

and was in receipt of no other income than that derived from its rental, and has no assets other than that property and the income thereof. It was held to be doing business within the meaning of the act. The Minehill Company, it seems to me, is doing more and a greater variety of business than was attributed to the Park Realty Company as the basis of the assessment upon it. Others of the realty companies held taxable in the *Corporation Tax Cases*, it seems to me, were engaged in as little business activity as is the corporation herein involved.

With deference to the majority opinion, I think the Minehill Company, upon the facts here adduced, is engaged in business and ought to be held liable to the tax.