# AMERICAN INVESTMENT SECURITIES CO. v. UNITED STATES.

## No. 3476.

Circuit Court of Appeals, First Circuit.

June 7, 1940.

F. H. Nash, of Boston, Mass. (Bailey Aldrich, of Boston, Mass., on the brief), for appellant.

W. Croft Jennings, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Edmund J. Brandon and C. Keefe and Sewall Key, Sp. Asst. to Atty. Gen.,

Hurley, both of Boston, Mass., on the brief), for appellee.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

This is another of those unsatisfactory cases calling for a determination whether, on particular facts, a corporation is "carrying on or doing business" within the meaning of the Revenue Acts.[1] No decided case is squarely in point; the criterion is none too sharply defined. The court below, in a suit by the taxpayer corporation to recover back capital stock excise taxes collected for the fiscal years ending June 30, 1933, 1934, 1935, and 1936, held that the corporation had been doing business during those years, and gave judgment for the defendant.

American Investment Securities Company, to be referred to hereinafter as the Securities Company, is a Maine corporation organized in 1900 under a charter broadly authorizing it "to buy, hold, sell, deal in or with, in any lawful manner, on commission, or otherwise, bonds, stocks, debentures, debts, claims, and securities of all kinds, and all real and personal property, rights and interests necessary or proper or desirable in such business, but not to do a banking or trust company business in the State of Maine". Its chief activity has had to do with the financing of the Columbian National Life Insurance Company, hereinafter called the Insurance Company, a corporation created by a special act of the Massachusetts legislature in 1902. The relationship between the two companies was set forth in a contract dated December 5, 1906. Under the terms of this contract the Securities Company became obligated to make an initial advance of $250,000 to the Insurance Company, and to pay all the necessary expenses of the latter up to September 11, 1932, when this obligation to finance the Insurance Company was to end. The Securities Company also obligated itself to act as general agent of the Insurance Company in the solicitation of business; to use its best efforts in the advancement of the interests of the Insurance Company; and to make no contract for its services with, or to act for, any other company engaged in the business of life insurance. The Insurance Company on its part agreed to pay back the amount of all moneys advanced by the Securities Company up to September 11, 1932, in the manner stipulated in detail in the contract. It was agreed that the Securities Company was to receive as profits for its services a certain percentage of the premiums paid to the Insurance Company on policies in force. In addition, during the life of the contract, the Insurance Company bound itself to submit to a measure of control by the Securities Company in the matter of hiring agents and brokers and fixing their compensation.

The contract was carried out in accordance with its terms. After September 11, 1932, the Securities Company ceased to finance the Insurance Company, and ceased also its activities as general agent of the Insurance Company. After that date, however, the Insurance Company continued to be obligated to pay the Securities Company, on monthly settlements, 42½ per cent of the expense loadings received upon all ordinary and child's endowment policies and 10 per cent of the gross premiums received upon industrial insurance other than child's endowment policies, with respect to policies in force on September 11, 1932. It was estimated that the Securities Company would continue to receive payments under this provision for about thirty years.

From the outset the Securities Company acquired and maintained a dominant interest in the capital stock of the Insurance Company. On September 11, 1932, the Securities Company owned about 71 per cent of the 20,000 outstanding shares, its holdings being valued at over $2,000,000. Further, it had a considerable cash account and held a portfolio of miscellaneous stocks of various insurance companies, trust companies and commercial companies, valued at over $200,000. However, no changes were made in these miscellaneous investments during the taxable years now in question except that in May, 1936, the Securities Company exercised a few rights which it received on its stock in the State Street Trust Company. Its surplus was around $650,000 with no bonded indebtedness.

[1] § 215(a), National Industrial Recovery Act, 48 Stat. 207; § 701(a), Revenue Act of 1934, 48 Stat. 769, 26 U.S.C.A. Int. Rev.Acts, page 787; § 105(a), Revenue Act of 1935, 49 Stat. 1017, 26 U.S.C.A. Int.Rev.Acts, page 796; § 401(a), Revenue Act of 1936, 49 Stat. 1733, 26 U.S. C.A. Int.Rev.Acts, page 943.

After September 11, 1932, the Securities Company kept its corporate organization intact, paid small salaries to its officers, and at no time did it attempt to liquidate its affairs. In its brief, the Securities Company explains that during the estimated period of thirty years "the continued existence of the petitioner as a conduit to accept these periodic distributions from the Columbian and convey them to its stockholders is a practical necessity". Stockholders' and directors' meetings of the Securities Company were regularly held during the period in question, and officers from time to time were authorized to vote the stock of the Insurance Company held by the Securities Company. There was an interlocking both of directors and officers of the two companies. The head office of the Securities Company continued in Portland, Maine, where it maintained a clerk. For many years it also occupied offices of its own in Boston but in 1912 moved into offices of the Insurance Company there. At regular intervals during the tax years dividends were paid to the stockholders of the Securities Company.

At various times during the period from 1932 to 1936 the Securities Company continued to augment its holdings of capital stock of the Insurance Company. This stock was unlisted but was occasionally sold at public auction, and the Securities Company made a market for it by taking what was offered. Mr. Francis P. Sears, who was both treasurer of the Securities Company and president of the Insurance Company, testified that the Securities Company continued to increase its Insurance Company holdings "for the purpose of safeguarding its investment, that is, maintaining the market value, and in order to keep its control intact; that it felt that 51 per cent would probably give control, but that it was not sure but felt that 66⅔ds per cent would give a better control, and when it had obtained that it felt that 75 per cent would give it still better control; that lawyers had told him that in certain cases 75 per cent gave an advantage over 66⅔ds per cent and in other cases 80 per cent; that it had never striven for any particular percentage". He explained that the Securities Company had a large investment in this stock and "did not want a bad break which might disturb the policyholders"; further, "he believed the plaintiff intended to continue to acquire stock

in this way and would not be averse to having it all; that if it had all it could put an end to the contract which had been a burden on the Columbian in some of the bad years and that if there were another depression it would be desirable to do away with it entirely". He also testified that the Securities Company "maintained its investment portfolio, and in 1935 $200,000 in cash, in case if the Columbian increased its capital it would be in a position to exercise its rights and protect its investment position, or supply the Columbian with money if it needed it".

In December, 1934, the directors of the Securities Company partially released the Insurance Company from its obligation under the 1906 contract to make certain payments resulting from its operations for the year 1934. The vote recited that "it is most desirable for this Company as the holder of over 70 per cent of the capital stock of said Insurance Company that the Insurance Company's surplus be maintained at a substantial figure", and recited further that the payment at this time of the sums due under the contract "would unduly reduce said surplus". A similar vote was passed by the directors of the Securities Company in December, 1935.

From the foregoing statement we think it appears that the Securities Company is "outside the class of those inert companies, which can assert that they are mere dry holders of property, and conduits to carry over its profit to the persons eventually entitled". Argonaut Consolidated Mining Co. v. Anderson, 2 Cir., 52 F.2d 55, 57; Edwards v. Chile Copper Co., 270 U.S. 452, 456, 46 S.Ct. 345, 70 L. Ed. 678. It is still in active quest of profits and has not abandoned the business from which it originally sought to derive those profits. It has, rather, since 1932 entered upon a less active phase in fulfillment of a long-term contract made in 1906 and estimated to yield profits for a remaining period of 25 years or more. The continued functioning of the Securities Company is indeed a "practical necessity", for realization of the anticipated profits calls for constant preoccupation of the Securities Company with the affairs of the Insurance Company and with the maintenance of its dominant position therein. Supervision of the management of the Insurance Company is facilitated by the fact of interlocking officers and directors and by the voting of the controlling

stock interest. Watchful "nursing along" of the Insurance Company is evident from the action of the directors of the Securities Company in 1934 and again in 1935 in relieving the Insurance Company somewhat from the burden of payments under the 1906 contract, in order not to impair the latter's surplus. The continuous acquisition by the Securities Company of stock of the Insurance Company as it came on the market was considered advantageous for two reasons, in addition to the intrinsic merit of the stock as an investment. First, it tended to prevent a "bad break which might disturb the policyholders", leading them to surrender their policies and thus diminishing future payments to the Securities Company of the stipulated percentage of premium receipts. Second, it might prove to be desirable from the point of view of the stockholders in the Securities Company to remove altogether the conflict of interest between that company and the Insurance Company by the acquisition of all the stock of the Insurance Company and the termination of the contract of 1906 "which had been a burden on the Columbian in some of the bad years".

Under these circumstances we see no just reason why the present taxpayer should not share with other corporations the burden of the capital stock tax imposed "with respect to carrying on or doing business". The Revenue Act "requires no particular amount of business in order to bring a company within its terms". Von Baumbach v. Sargent Land Co., 242 U.S. 503, 517, 37 S.Ct. 201, 204, 61 L.Ed. 460. The tendency of the decisions has been to confine the exemption rather narrowly, and the facts of the case at bar offer no moving reason for reversing that tendency in favor of appellant. We think that the Securities Company comes fairly within the language of the Supreme Court in its last considered opinion on this point, Edwards v. Chile Copper Co., 270 U.S. 452, page 455, 46 S.Ct. 345, 346, 70 L.Ed. 678, where the court said: "It was organized for profit and was doing what it principally was organized to do in order to realize profit. The cases must be exceptional, when such activities of such corporations do not amount to doing business in the sense of the statutes. The exemption 'when not engaged in business' ordinarily would seem pretty nearly equivalent to when not pursuing the ends for which the corporation was organized, in the cases where the end is profit."

Appellant particularly relies on McCoach v. Minehill & S. H. Ry. Co., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842, and Eaton v. Phoenix Securities Co., 2 Cir., 22 F.2d 497. The McCoach case does indeed show that a corporation may be regarded as not "doing business" even though it has made no attempt to liquidate its assets and though its full corporate powers remain unimpaired. However, it does not appear in that case that the taxpayer-lessor, in order to protect its investment, was constantly preoccupied with the affairs of the lessee corporation and maintaining a market for its stock. As to the Eaton case, supra, some of the language looks the taxpayer's way, but the facts are not on all fours, one distinguishing feature being that in the present case the taxpayer is not a subsidiary dominated by another corporation (as in the Eaton case) but on the contrary, itself controls a subsidiary. Cf. Hastings Pavement Co. v. Hoey, D.C., 28 F.Supp. 897.

The judgment of the District Court is affirmed.