## UNITED STATES v. HERCULES MINING CO.

No. 9676.

Circuit Court of Appeals, Ninth Circuit.

April 28, 1941.

Rehearing Denied June 9, 1941.

John A. Carver, U. S. Atty., and E. H. Casterlin and Paul S. Boyd, Asst. U. S. Attys., all of Boise, Idaho, Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Alexander Tucker, and John J. Pringle, Jr., Sp. Assts. to Atty. Gen., for appellant.

John H. Wourms and Paul B. Jessup, both of Wallace, Idaho, for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appeal presents the question whether, during the tax years ending June 30, 1934, and June 30, 1935, appellee was carrying on or doing business within the terms of § 701(a) of the Revenue Act of 1934,[1] 48 Stat. 680, 769, 26 U.S.C.A. Int.Rev. Acts, page 787, and was thus subject to capital stock taxes for those years. Upon the denial of its claim of exemption appellee paid the taxes and brought this suit for refund.

Appellee was incorporated under the laws of Delaware in 1923 for the purpose of engaging in the business of mining and was thereafter licensed as a foreign corporation in Idaho. It had as its predecessor a mining partnership of the same name which had carried on extensive operations in the Hercules mine and at its milling plant in Shoshone county, Idaho. The corporation took over the property and continued the operations until 1925 when the Hercules ore body became exhausted. For some years afterwards the corporation explored its ground in the hope of discovering possible extensions of the ore bodies, but the exploratory work proved unsuccessful and was discontinued about 1931 or 1932. Following the termination of its productive operations in 1925 the taxpayer utilized its mill and concentration plant as a custom mill for the treatment of ores from other properties in the locality which were without milling facilities of their own. In September, 1932, these operations were temporarily discontinued, as the decline in base metal prices occurring during the period of the depression brought about a shutdown of the mines supplying the ores. This state of affairs continued until the latter part of 1935 when the taxpayer leased its milling facilities to another company which operated the mill for about a year. In May, 1937, the taxpayer resumed its custom milling operations and has since continued to carry on that business.

The property of the Hercules Company is an extensive one, consisting of large underground workings and a very substan-

1 "§ 701. Capital Stock Tax

"(a) For each year ending June 30, beginning with the year ending June 30, 1934, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock."

tial amount of mining machinery and equipment located both underground and at the surface. In addition there is the mill with its machinery and equipment at Wallace; also dwelling houses formerly occupied by employees, and a structure called Community Hall located near the mine. The watching and maintainence of the entire plant called for the expenditure of relatively large sums for labor, materials, supplies, fuel, light and power, compensation for employees, fire and water protection, taxes and insurance. For these purposes the taxpayer expended for each of the two years in question sums in excess of $30,000. Its working capital and surplus funds had for the most part been invested in bonds and time certificates of deposit which likewise required attention, as interest thereon had to be collected and the proceeds derived upon the maturity of these securities had to be reinvested. Taxpayer had a large investment in the capital stock of several inactive subsidiaries which it had acquired in its prior operations, and it was obliged on this as well as on its own account to retain an office force to keep the corporate records and provide supervision and management. The office, legal and general expense of this nature for each of the two years was in excess of $5,500. All taxpayer's corporate officers except the assistant manager and assistant secretary served without compensation during the period. Due to this relatively large overhead it was not possible for the taxpayer to make profits during the two years, as its revenues were not sufficient to meet its fixed charges. The gross income received in the first year was $31,482.81 of which a little less than $28,000 was from interest, and of the gross income of about $29,000 received during the second year all but about $4,400 was from interest. The total expenses, including depreciation, amounted to $53,743.54 in the first year and $46,608.-48 in the second, with the result that working capital and surplus funds were diminished.

All work necessary to conserve the inactive subsidiaries was done by employees of the taxpayer, the subsidiaries being charged for these services on a cost basis, the arrangement being purely one of convenience. Taxpayer occasionally made advances or loans to some of these companies on a non-interest basis to defray necessary expenses in the maintainence and protection of their properties. The overwhelming proportion of the activities carried on or transactions engaged in during the period was solely for the maintainence of taxpayer's corporate existence, the ownership, holding, protection and preservation of its property and funds and the collection of the avails therefrom. There were, however, certain other transactions or activities of a non-continuous nature, among them being the following: During both years former or part-time employees were given the privilege of gathering ore from the old mine workings and selling it. These operations were very minor in character, and the royalty collected by taxpayer upon the sale of this ore amounted to about $100 for each year. When taxpayer closed down its custom mill it had large quantities of fuel oil on hand. Desiring to dispose of this oil, it sold the same at cost to some of its employees and others, who paid the transportation expenses from the storage tanks. When the supply of oil was exhausted, taxpayer made further purchases, which were likewise sold at cost; but the practice was discontinued about the end of calendar year 1933. During the first year in question taxpayer made a final payment to a consulting geologist for services rendered in connection with an examination of its property made prior to 1930. In the second of the two years taxpayer paid to one of its directors $393.37 on a final accounting made for the purchase of stocks of other corporations in the years 1928 and 1929. During the second year, also, a payment of about $500 was made to taxpayer's president to reimburse him for expenditures made in connection with the examination of a mining property in California, the latter work being carried on by the president on his own initiative. In the second year taxpayer sold $23,000 par value of United States bonds at a profit of $228.81. This transaction was had in order to forestall loss of a profit on the investment in the event the bonds should be called.

The foregoing is a summary of the findings, concerning which there is no dispute. The court concluded as a matter of law that appellee was not carrying on or engaging in business within the meaning of the statute during either of the two years, and that the Commissioner was in error in declining to allow claims for refund. Judgment was accordingly entered in favor of the taxpayer.

■ The tax is assessed upon the privilege of doing business in a corporate ca-

pacity. What constitutes doing business? The courts have wrestled with the question many times[2] but no formula has been deduced to fit all situations; and the decision in each case must necessarily hinge upon the particular facts. As defined in the leading case of Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 204, 61 L.Ed. 460, the word "business" means "that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit."

The fact that appellee derived no profit, but rather suffered a net loss, is not material, for the ultimate aim of all it did was profit; taxpayer is not an eleemosynary institution. It had not undertaken and its stockholders did not appear to contemplate the liquidation of its assets or the winding up of its affairs; nor had it disqualified itself in a legal sense from engaging in any of the activities permitted by its charter. On the contrary, its milling business was resumed as soon as renewed enterprise in the district began to supply ores. Meanwhile it had its plant to conserve and keep in order against the day when the facilities would be in demand, and its very large amount of liquid capital had to be kept employed in a way judged suitable to the exigencies of the times. In short, taxpayer was pursuing its corporate end of ultimate profit in the light of the particular circumstances which then confronted it.

We do not rest our decision upon any particular activity of the corporation. Perhaps each might be examined separately and separately discarded as not of a character so substantial as to be called business. But taxpayer's situation and activities must be judged in their entirety, Edwards v. Chile Copper Co., supra, note 2. We think it was doing business and should be held subject to the tax.

Reversed.

---

[2] Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 35 S. Ct. 499, 59 L.Ed. 825; Flint v. Stone Tracy Co. (Cedar Street Co. v. Park Realty Co.), 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; McCoach v. Minehill & S. H. R. Co., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842;

Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678; United States v. Peabody Co., 6 Cir., 104 F. 2d 267; Lyon Lumber Co. v. Harrison, 7 Cir., 113 F.2d 443; American Investment Securities Co. v. United States, 1 Cir., 112 F.2d 231; Page v. M. Rich & Bros. Co., 5 Cir., 99 F.2d 607; United States v. Atlantic Coast Line Co., 4 Cir., 99 F. 2d 6; Harmar Coal Co. v. Heiner, 3 Cir., 34 F.2d 725.