## UNITED STATES v. WESTERN SHORE LUMBER CO.

### No. 10243.

Circuit Court of Appeals, Ninth Circuit.

May 25, 1943.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, Paul S. McMahon, and Lester L. Gibson, Sp. Assts. to the Atty. Gen., and Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst., U. S. Atty., both of San Francisco, Cal., for appellant.

A. Crawford Greene, Henry D. Costigan, and Scott Elder, all of San Francisco, Cal. (McCutchen, Olney, Mannon & Greene, of

---

[8] 3 Moore, Federal Practice, 3155.

[9] Clark, Code Pleading (1928) 28.

San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

The United States appeals from an adverse judgment entered in the court below adjudging the appellee entitled to recover, as refunds, moneys collected from it under the capital stock tax act for the fiscal years ending June 30, 1933, 1934, 1935, and 1936. The complaint filed in the court below alleged that the action was one to recover taxes in the nature of capital stock taxes for the years above enumerated, allegedly illegally and erroneously assessed and collected. Issue was joined on the question whether the plaintiff was "doing business" within the intendment of the taxing acts, and trial was had to the court, without jury, resulting in the judgment above referred to. The trial court made findings of fact, upon which we draw for our statement resorting, at times, to quotation therefrom.

The plaintiff, Western Shore Lumber Company, was organized in 1905 for the purpose of acquiring certain timber land lying in San Mateo and Santa Cruz Counties, California. Its organizers believed at the time that a railroad was intending to build a branch line through the area acquired, but this did not come to pass and the plaintiff never engaged in active or intensive lumbering operations. Between 1905 and 1910 the company received a total of $36,449.56 for timber and tanbark which it permitted to be removed from its land. This money was used to pay taxes and current expenses. During the period 1911 to 1922, the plaintiff received $25,094.-63 from a similar source and in 1920 sold a portion of the acreage to the State of California for park purposes for the sum of $38,400. Further, for a brief period in 1918-1919 the company operated a small shingle mill, but the mill was closed in 1921 and not thereafter operated. Except for the limited activity of the shingle mill the company has never itself engaged in lumbering operations, and since that time it has confined its activities to maintaining and holding its properties until such time as the same could satisfactorily be liquidated. The plaintiff paid Federal capital stock taxes in 1923, 1924, 1925, and 1926, but subsequently filed claims for refund, which were allowed in 1929, upon the ground that the Company was not engaged in business during such years.

Taxes assessed against the company property, substantial in amount, have been met by the company in various ways. At times the payments have been made out of funds on hand and at other times from loans by stockholders. During the period from 1925 to 1929 moneys to pay taxes were raised by levying assessments upon the stockholders. In 1929, however, a stumpage contract was entered into with Santa Cruz Lumber Company whereby the latter was permitted to cut timber from an isolated section of plaintiff's properties and was required to pay for the timber felled. Receipts from this source were used to pay the taxes and to reduce the indebtedness to stockholders. On July 1, 1932, the indebtedness amounted to $66,850.75.

"The period in issue in this action is the period from July 1, 1932 to June 30, 1936. At the commencement of this period, as for many years previously, the assets of the Company consisted solely of approximately 12,500 acres of timber lands in San Mateo County and approximately 550 acres of timber lands in Santa Cruz County, State of California, and certain cash in bank accounts. During the period from July 1, 1932 to June 30, 1936, the Company carried on no activities other than the holding and safeguarding of these timber properties and occasional negotiations looking toward their disposition as a whole. * * *"
During the above period there were no meetings of stockholders and but three meetings of the board of directors, two of which were held in 1933 and one in 1936. Except for the execution of a supplemental agreement in 1936 with the Santa Cruz Lumber Company, the company executed no contracts whatsoever during the period from July 1, 1932 to June 30, 1936. "The Company purchased no property during this period, other than miscellaneous office supplies. It made no investments of any kind. It sold no property and carried on no business activities for profit. The only receipts of the Company during this period were interest on its bank accounts and receipts under its stumpage contract with the Santa Cruz Lumber Company." The only salaried employees of Western Shore were a secretary at $25 a month and a caretaker employed to maintain trails through the timber and as a fire watcher, who received the sum of $1800 per annum as salary and allowances. In addition, the company paid, during this period, $300 per annum as part compensation to a tallyman who checked the correctness of the timber run at the San-

ta Cruz Lumber Company mill. The only distribution to shareholders were payments of interest and principal upon indebtedness previously incurred for the purpose of paying taxes.

The company property is mostly redwood timber land but, during the period in question, at least, the company did not contemplate engaging in timbering operations thereon. It has been hopeful, in view of the fact that it is the only large holding of redwood timber remaining in the vicinity, that it would be able to dispose of the entire holding, especially to the State of California or the County of San Mateo. Prior to the period in question the company had, on several occasions, given options to prospective purchasers, but no options were given between July 1, 1932 and June 30, 1936. The company is unwilling to enter into a program of logging contracts, which would deforest and leave bare the acreage. The path of the Santa Cruz Lumber Company operations runs through an isolated section of Western Shore's property and its operations have deforested an area of approximately 1500 or 1600 acres. In the opinion of Western Shore's president the deforested lands are worth about fifty cents an acre.

"The receipt of income under the timber stumpage contracts between the Company and the Santa Cruz Lumber Company constitutes the only difference between the activities of the Company during the period from July 1, 1932 to June 30, 1936 and its activities during the period from 1922 to 1926 when the Company was not engaged in business for Federal capital stock tax purposes."

The company entered into the timber stumpage contracts for the purpose of securing funds with which to pay its current expenses and property taxes. The first contract with Santa Cruz Lumber Company was executed April 23, 1929, respecting 480 acres of land, from which it was granted the right to remove all redwood and pine lumber and tanbark, at specified rates, with a minimum guaranteed payment of $10,000. The determination of the measure of lumber and tanbark was to be made by tally at the "tail end" of the Santa Cruz Lumber Company mill by a tallyman, whose expenses were to be borne equally by the contracting parties. "The Santa Cruz Lumber Company was required to proceed continuously with the removal of. timber and tanbark from the lands described, and the Company had the right to inspect the oper-

ations of Santa Cruz Lumber Company and its books and records for the purpose of ascertaining that all of the provisions of the contract were complied with." This contract, by its terms, expired two years from the date of execution. A second contract, similar thereto, covering 1360 acres of land, and extending for an eight year term, was entered into by the same parties March 10, 1930. A supplemental agreement was made January 17, 1936, for the purpose of including in the 1930 contract the 480 acres covered by the 1929 contract.

The company beyond engaging and paying the tallyman, did not conduct active lumbering operations, nor did the timber stumpage contracts so require. As proceeds of the stumpage contracts, the appellee received from Santa Cruz Lumber Company the sum of $21,206.70 in the year ending June 30, 1933; $32,372.78 in the year ending June 30, 1934; $4,625.93 in the year ending June 30, 1935; and $9,404.54 in the year ending June 30, 1936. In each of the fiscal years these receipts were used to pay taxes, current expenses, and interest and, after setting aside a reserve for future taxes, the remainder was used to retire in part the company's indebtedness to its stockholders. During the period in question the indebtedness was reduced by $13,821.89 and subsequently was entirely paid off out of the timber stumpage receipts. For the period January 1, 1932 to December 31, 1936, the Company had a profit, for income tax purposes, of $10,007.86, out of the receipts of the timber stumpage contracts.

"The timber stumpage contracts did not contemplate that the Company itself would engage in any operations, and the Company itself did not in fact do so. The contracts were in substance simply a license to an operating timber company to cut timber from an isolated section of the Company's properties under an agreement to pay for the timber so cut. The land from which the timber was cut was rendered substantially valueless and the operation amounted in essence to a liquidation of the property from which the timber was cut."

Except for the supplemental agreement dated January 17, 1936, the stumpage contracts were not executed in the period in question and the only activities of the company were the receipt of the payments and engagement and payment of the tallyman.

The parties are agreed that the sole question presented by this appeal is whether the taxpayer was doing business in the taxable years within the meaning of the capi-

tal stock tax law. The Government contends that the Supreme Court decision of Magruder v. Washington, B. & A. Realty Corp., 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278, wherein a corporation organized to liquidate certain properties, and which was doing so, was held to be "doing business" within the meaning of the capital stock tax law, is controlling and requires a reversal of the judgment entered below. This decision also held that the taxpayer's situation was covered by the Regulations, which were held to be both binding and valid. The appellee, on the other hand, urges that it was not organized as a liquidating corporation, nor was it actively engaged in liquidating and that Magruder v. Realty Corp., supra, is not in point. The Government argues that no distinction is to be made, nor is one indicated by the decision, respecting the purpose for which the corporation was organized, so long as the activities of the corporation are pursued with liquidation in view. Since the law was substantially the same in each of the years in question, we quote only the Revenue Act of 1935 in the margin, setting out the citations for the other years. The applicable Treasury Regulations are also set forth in the marginal note.[1]

[1] The Revenue Act of 1935, Section 105(a), 49 Stat. 1014, 1017, 26 U.S.C.A. Int.Rev.Acts, page 796, Section 1200, I. R.C., 26 U.S.C.A. Int.Rev.Code, § 1200, reads as follows:

"(a) For each year ending June 30, beginning with the year ending June 30, 1936, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1.40 for each $1,000 of the adjusted declared value of its capital stock."

For 1933: National Recovery Act, Section 215, 48 Stat. 195, 207.

For 1934: and 1935: Revenue Act of 1934, Section 701, 48 Stat. 680, 769, 26 U.S.C.A. Int.Rev.Acts, page 787.

Treasury Regulations 64 (1936 Ed.):

"Art. 41. Nature and rate of Tax.— The tax is an excise tax imposed with respect to carrying on or doing business during a taxable year ending June 30, or any fractional part thereof. It is an excise tax upon the privilege of doing business and not on the business itself and is imposed upon each corporation with respect to carrying on or doing business and not upon each business carried on. If more than one corporation is engaged in carrying on a single business, each must file a return and pay the tax. * * *

"Art. 42. Doing Business.—The term 'business' is very comprehensive and embraces whatever occupies the time, attention, or labor of men for profit. Accordingly, regardless of the nature of its activities, any corporation organized for profit and carrying out the purpose of its organization is doing business within the meaning of the Act. Similarly, even if not organized for profit, any corporation which nevertheless engages in activities ordinarily carried on for profit is also doing business. It is immaterial whether the activities result in a profit or loss, whether the corporation has been successful in its enterprise, or that because of unfavorable business conditions no operations are carried on for a particular period. No particular amount of business need be done, nor is it necessary that the business be continuous throughout the taxable year.

"The case is exceptional in which the activities of a corporation organized for profit do not amount to doing business within the meaning of the Act. Such a case is generally limited to one in which the corporation is not pursuing the ends for which organized, i. e., profit.

"Art. 43. Illustrations.—(a) General. In general 'doing business' includes any activities of a corporation whether it engages in—

"(1) buying, selling, manufacturing, developing, financing, speculating or otherwise dealing in property of any description;

\* \* \* \* \*

"(3) Leasing or managing properties, collecting rent or royalties;

\* \* \* \*

"(5) the orderly liquidation of property by negotiating sales from time to time as opportunity and judgment dictate and distributing the proceeds as liquidation is effected—for example, the liquidation of an estate, or of properties taken over from another corporation, or of the shareholders' fractional interests in particular property; or

"(6) any other activities coming within the ordinary and natural signification of the term 'carrying on or doing business'.

"(b) Exceptions.—Ordinarily the exceptions to 'doing business' are restricted to limited activities of a corporation, such as—

\* \* \* \* \*

"(2) the distribution of the avails of property and the doing only of such acts as may be necessary for the maintenance of its corporate status in the case in which the corporation either was organized for, or has reduced its activities to, the mere owning and holding of specific property."

The appellee corporation was not formed for the purpose of liquidating real estate holdings, but it clearly appears from the findings that such was its intention during the years in question, and had been its intention for some years prior thereto. There is also a clear finding that the logging operations conducted by Santa Cruz Lumber Company for the appellee "amounted in essence to a liquidation of the property from which the timber was cut." While, under these circumstances, the case of Magruder v. Washington, B. & A. Realty Corp. might well support a reversal as sought by the Government, we prefer not to rest our judgment upon this decision alone.

This case in many respects and, indeed, in the general scope of the problem, presents a similar question to that which confronted us in Section Seven Corp. v. Anglim, Collector, 9 Cir., 136 F.2d 155, this day decided. In that opinion we reviewed some of the more important Supreme Court decisions dealing with the question of "doing business" and we here make reference to them, and to other cases there cited and referred to, in order to avoid needless rehearsal of the matter therein contained.

■ We think the appellee corporation finds itself in the position of doing business in some years and not in others. What was the status of the corporation in the years in question? We inquire whether it was dormant—in a state of quietude; whether its activity was limited to maintaining a status quo, simply keeping alive its corporate existence. Upon the facts found it appears that the activity engaged in exceeds such mere negative activities. But, the situation and activities must be considered in the entirety (Edwards v. Chile Copper Co., 270 U.S. 452, 455, 46 S.Ct. 345, 70 L.Ed. 678; United States v. Hercules Mining Co., 9 Cir., 119 F.2d 288, 291) and we should look into the past as well as the present. Lyon Lumber Co. v. Harrison, Collector, 7 Cir., 113 F.2d 443, 446. Comparing the past with the years in question does not reveal a diminishing or reduction of activities (Art. 43(b) (2), Reg. 64) but, instead, there was an increase in the corporate activities in the years here involved, over those preceding. Instead of a recession there is here a stirring into activity, an awakening to renewed effort. This alone is sufficient to distinguish the McCoach v. Minehill & S. H. R. Co. case, 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842, the case upon which all those who claim not to be doing business rely.

Quite similar in most respects, save one, to the instant case is United States v. Hotchkiss Redwood Co., 9 Cir., 25 F.2d 958. There, the appellee was organized to own, hold and resell certain timber land; it levied assessments to pay taxes, interest and other necessary expenses; to avoid condemnation proceedings it sold a strip of land to Del Norte County; it paid a nominal salary to a secretary and to its president; it maintained its corporate existence; and, from time to time, carried on negotiations with brokers looking for a sale of its lands as a whole, but no person had been employed for that purpose. In affirming a judgment for refund of taxes paid, and holding that the lumber company was not doing business, this court said (25 F.2d at page 959):

"From 1906 to 1924 the defendant in error and its predecessor in interest owned and held this tract of timber land as their only asset. During that period they made no use of the land, added nothing to it, took nothing from it, engaged in only such narrow activities as are incident to the ownership of property, and it would be going very far to say that such corporations are carrying on or doing business within the meaning of a revenue law."

The distinction lies in the activity or non-activity and it is in this respect that this case differs from the Hotchkiss case. Here a use is made of the land, there, none; here something is taken from the land, there, nothing; here are lumbering operations, deforestation of an area, and a realization of the fruits of such activity, there, only such activity incident to the ownership of property. It is precisely these things which exist in the years in question, which did not occur in the years when the appellee was not doing business (within the meaning of the statute), and it is a fair inference that if the activities which are present here had been in the record in the Hotchkiss case, an opposite result would have been reached.

The appellee was formed, and empowered by its charter, to engage in the lumbering business. Such business was engaged in, on land which it owned, under a contract to which it was a party, and through which it realized income. Since a corporation can act only through agents, it is immaterial whether the appellee itself actively logged the area, or whether another did so for it. Surely, if Western Shore had done the logging and milling and selling, or any one ·

of these things, it could not claim to be dormant, in a state of quietude. That it permits or procures another corporation to perform the actual labor and, in conjunction with that other, enjoys the fruits thereof cannot relieve it of the label of "doing business". That the logging was confined to a particular area is simply a matter of degree.

■ It cannot be successfully contended that the profit motive was absent and that, therefore, its activities were not within Article 42 of the regulations, in that it was not pursuing the ultimate end of its existence. To what use it put its income, that is, whether to pay debts or dividends, is immaterial to decision of the question whether or not it was doing business.

■ We are compelled to conclude, on the facts found, that the appellee was doing business during the years in question, within the meaning of the statute. See Section Seven Corp. v. Anglim, Collector, 9 Cir., 136 F.2d 155; Flint v. Stone Tracy Co., 220 U.S. 107, 170, 171, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312; Edwards v. Chile Copper Co., 270 U.S. 452, 455, 46 S.Ct. 345, 70 L.Ed. 678; Magruder v. Washington, B. & A. Realty Corp., 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278; United States v. Hercules Mining Co., 9 Cir., 119 F.2d 288, 291; Chemung Iron Co. v. Lynch, 8 Cir., 269 F. 368, 370, 371.

Judgment reversed and cause remanded for further proceedings in accordance with this opinion.