Factoria Land Company v. Commissioner.
Factoria Land Co. v. Commissioner
Docket No. 2702.
United States Tax Court
1947 Tax Ct. Memo LEXIS 289; 6 T.C.M. (CCH) 234; T.C.M. (RIA) 47051; February 28, 1947
*289 Held, that petitioner was engaged in carrying on or doing business during 1940 and is subject to the declared value excess-profits tax under Section 600, I.R.C., as amended. Held, that property sold in 1940 was held primarily for sale to customers in ordinary course of petitioner's business within Section 117 (a) (1), I.R.C., as amended, and the gain realized was ordinary income subject to excess-profits tax under Section 711, I.R.C., as amended. Henry Donham, Esq., 701 Boyle Bldg., Little Rock, Ark., for the petitioner. John W. Alexander, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent has determined deficiencies against petitioner for the calendar year 1940 in the amounts of $84.94 *290 income tax, $1,746.40 declared value excessprofits tax, $1,090.18 excess-profits tax, and a 25 per cent penalty amounting to $272.55 for failure to file an excess-profits tax return within the time prescribed by law. The taxes in controversy are the declared value excess-profits tax, excess-profits tax, and penalty totaling $3,109.13. The parties have agreed that petitioner did not file an excessprofits tax return and, further, that the deficiencies and penalty as computed by respondent are mathematically correct, if he is sustained in his determination of petitioner's liability for such taxes. The pleadings present the following issues: (1) Whether petitioner was carrying on or doing business during 1940 and therefore subject to the declared value excess-profits tax under section 600, I.R.C., as amended; (2) Whether the profit realized by petitioner from a sale of 110.5 acres of land in 1940 constituted ordinary income subject to excessprofits tax under section 711, I.R.C., as amended, or constituted a long-term capital gain under section 117, I.R.C., as amended, and therefore to be excluded from excessprofits *291 net income under section 711 (a) (1) (B), I.R.C., as amended. (3) Whether the asserted 25 per cent penalty should be imposed. Findings of Fact The petitioner, an Arkansas corporation, filed an income tax return for the calendar year 1940 with the collector for the district of Arkansas. Petitioner has no address other than that of its president and principal stockholder, viz, Route 5, Box 5, Little Rock, Arkansas. The petitioner's charter, issued under the laws of Arkansas, on March 20, 1911, authorized it, inter alia, (1) to buy, sell, mortgage, rent, improve, exchange, and otherwise acquire, dispose of, and deal in real property; to build, construct, and alter houses and other buildings thereon; to manage, develop, till, and improve real property generally; (2) to buy, sell, acquire, hold, own, mortgage, pledge, lease, assign, transfer, trade, and deal in and with goods, wares, merchandise and property of every kind, nature, and description pertaining to the real estate business; (3) to purchase, construct, lease, operate, and maintain railways, rights-of-way, easements, and appurtenances; and (4) to construct, purchase or otherwise acquire, maintain, *292 repair and operate sewers and waterworks, and to sell, lease or rent rights and privileges. The petitioner was organized by Messrs. Cammack, Ledwedge and Read, with each owning one-third of the capital stock for the principal purpose of purchasing for development as an industrial center and reselling for profit a tract of 759 acres of farm land known as Factoria, situated east of and adjacent to the City of Little Rock, and such property was purchased by petitioner on March 21, 1911. No other real estate was ever purchased by petitioner for development or resale. At the time such acreage was purchased by petitioner, the Little Rock Board of Commerce was fostering a movement for industrial development in that city and petitioner immediately started negotiations for the sale of its property to the Board of Commerce under a proposed plan that the latter develop about 40 acres into high priced residential lots and use the profits from the sale thereof to develop a factory-center cite. However, these negotiations failed in achieving any result. Thereafter, petitioner adopted a plan pursuant to which it subdivided and recorded the plat of a small portion of the acreage into streets, *293 blocks, and residential lots. The subdivision was designated as Factoria Addition to the City of Little Rock, and petitioner offered such lots for sale under a plan whereby a certain percentage of the sale price would be held as a fund to be expended in an effort to secure the erection of factories in that area. Under this plan a high powered sales campaign conducted through the Read Real Estate Company resulted in sales of lots which continued through 1915 and 1916. Sometime during World War I, 1917-1918, petitioner sold 150 odd acres of its property to the United States Government for the construction of a picric acid plant and thereafter petitioner discontinued its sales of residential lots because of the dissatisfaction of prior purchasers at what they considered too high prices paid for their lots. After the close of World War I, the picric acid plant was torn down and the utility gas line on the property was taken out. From that time on petitioner made no active attempt to sell its platted residential lots and none of its property was advertised or listed for sale. As of December 31, 1924, petitioner's total gross sales of real estate amounted to $132,603.43, and the cost *294 of the property so sold, including improvements and gravel road, amounted to $34,711.18, while the cost of the property on hand on that date was $57,217.97. During 1925 petitioner sold two lots for a total price of $400. Thereafter, no further sales of lots were made and petitioner refused several offers from individuals to purchase from two to eight acre tracts, because petitioner decided to hold its property for a profitable sale in one tract, if possible, in order to facilitate liquidation. On January 4, 1932, at the instance of petitioner, the County Court of Pulaski County, Arkansas, entered an order whereby the "Plat and Bill of Assurance" of Factoria Addition to the City of Little Rock was vacated and set aside as to all of Blocks Nos. 25 and 32 to 36, inclusive, then owned by and in possession of petitioner, including certain platted alleys and streets surrounded by such contiguous blocks and the land embraced in such blocks, alleys, and streets was directed in the order to be "known and assessed as acreage for taxation of all kinds." By reconverting those lots into acreage petitioner reduced its state and county taxes. In 1933 the petitioner sold approximately six acres *295 of its property to the United States Government for a total of $4,812.78 and paid a real estate commission of $962.55 on such sale. The particular size and location of such acreage was selected by the Government for the erection of an airway beacon. The petitioner would not have sold that particular acreage to an individual. In 1933 W. D. Cammack, president and principal stockholder of petitioner, made a trip to Washington in an effort to secure construction of a housing project on petitioner's land. During 1936 the petitioner executed three deeds; the first one being a deed to clear title in the owners of certain lots in Block 19, Factoria Addition to the City of Little Rock, as to which the original deed, issued in 1925, had been lost and never recorded; the second one being a deed to grant an easement to the City of Little Rock for a large sewer line across the property; and the third one being a quitclaim deed to clarify a certain title for county tax purposes. At some time during the 1930's, petitioner's property was sold for non-payment of state and county taxes, but it redeemed the property by payment of a reduced amount in compromise prior to 1940. In 1940 petitioner *296 sold approximately 110.5 acres of its property to the City of Little Rock for a total of $49,727.70 and paid a real estate commission of $4,972.76 on such sale. Such acreage was surveyed and selected by Government engineers for use in enlarging Little Rock's municipal airport and the sale was solicited by the City and not as the result of advertising or high pressure salesmanship. After consummation of that sale in 1940, petitioner made no further sales and the remaining 200 odd acres which it then owned were dividedd among its stockholders as a liquidating dividend, subsequent to 1940. On of the purposes for which petitioner was incorporated was to rent land for farming. In the early days of the petitioner's existence it rented farm land for approximately $3,000 a year. However, after the erection of the picric acid plant during World War I, there was a material decrease in the farming operations which were conducted by the lessee farmers on a share crop basis. From the date of its incorporation to January 1, 1925, the petitioner received a total of $23,329.90 in rentals. For the years 1925 to 1937, and 1939 to 1940, inclusive, the annual rentals received by petitioner from lands *297 owned by it and the ad valorem taxes paid on such property, and also the gross and net income, as reported on petitioner's income tax returns for those years, were as follows: GROSS INCOME
DEDUCTIONS
NET INCOME
(Inc. Rents)
(Inc. Taxes)
1925
$ 2,273.02
$1,380.36
$1,458.95
$ 946.64
$ 814.07
1926
1,342.78
1,336.85
918.01
911.66
424.77
1927
253.10
253.10
3,774.52
641.94
(3,521.42)
1928
1,652.73
1,652.73
823.39
763.39
829.34
1929
1,284.29
1,284.29
945.38
790.21
338.91
1930
767.22
767.22
2,312.45
857.54
(1,545.23)
1931
558.22
558.22
849.31
754.75
291.09
1932
175.35
175.33
271.21
187.47
( 95.86)
1933
2,568.04
406.78
2,279.71
631.71
288.33
1934
841.44
830.04
860.67
860.67
( 19.23)
1935
269.40
259.40
329.20
229.37
( 99.80)
1936
1,539.56
1,387.06
1,264.48
436.37
275.08
1937
970.10
945.10
1,162.94
45.91
( 192.84)
1939
1,057.28
1,049.78
1,082.57
692.26
( 25.29)
1940
18,966.02
1,198.68
1,727.74
1,196.05
17,238.28
During the above mentioned years petitioner's gross income in excess of rentals, consisted of interest or dividends, except for the years 1925, 1933, *298 and 1940, in which it made sales of real estate. For the various years petitioner's deductions in excess of taxes included such items as general operating expenses, interest, and occasional repairs and insurance. However, there were other deductions as follows: For 1927 a deduction for services, commissions, office expense, and supervision totaling $3,113.83; for 1930 a deduction for a loss on a note for rent amounting to $1,250; for 1933 deductions including such items as salary $50, abstract $30, attorney fees $50, commission on real estate sale $962.55, expense of W. D. Cammack and committee trip to Washington, D.C., to appear before the P.W.A. Board in rehousing project on Factoria $250, and expenses of Cammack in appearing before the Arkansas State Housing Board $150; for 1935 a deduction for supervision $100; for 1936 deductions for labor $65, and legal expense $751.10; for 1937 deductions for salaries $75, legal and audit $38, and compensation for Cammack, president, $976.12; for 1939 a deduction for compensation for Cammack, president, $300, and farm expense $80.31; and for 1940 a deduction for legal and expenses of audits $511.50. Petitioner's income tax returns for the *299 above tabulated years stated that it was in the real estate business and for 1926 and 1927 the returns also stated that petitioner was "inactive." Petitioner's capital-tax returns, for various years ended June 30, disclosed its common capital-stock to be 4,000 shares, par value $25 each, and further stated the original or adjusted declared value of its capital stock to be $30,000 for the years 1933, 1934, 1935, $20,000 for 1936, $19,970.08 for 1937, $10,139.47 for 1939, and $50,000 for 1940, and showed the capitalstock tax computed on such declared values. Petitioner's Arkansas franchise tax reports filed for the years 1923 to 1933, inclusive, reported the corporation as "inactive" and thereafter no franchise tax was paid and no report filed for a number of years; however, all back franchise taxes due were paid by petitioner either prior to or during 1940. From at least 1925 through 1940, W. D. Cammack was president of petitioner and from 1927 on he owned two-thirds of petitioner's stock. Cammack kept custody of and maintained the petitioner's records and looked after the affairs of petitioner which had no regular employees. From 1932 on Cammack's post office address constituted *300 petitioner's address. During the 1930's and also in 1940 Cammack's stock in petitioner was pledged as security on his personal note to a Little Rock bank which in turn pledged the note and security to the Reconstruction Finance Corporation, and during that period Cammack advised the bank that he was desirous of liquidating petitioner, but that the latter was holding its property for sale at an advantageous price rather than sell it at a sacrifice, and further he advised the bank fully as to the 1940 sale. From 1922 through 1939, petitioner's stockholders and/or directors held only five meetings, viz, in July 1922, March 1927, March 1928, February 1932, and December 1932, at which the only business transacted was the election of officers and directors. At a special meeting of petitioner's board of directors held on November 1, 1940, Cammack stated that petitioner "which had been in process of liquidation over a period of several years, had sold 110.506 acres of land in the Factoria Addition for an amount of $49,727.70, less 10 per cent commission" and, as proposed by Cammack, the board adopted resolutions providing, inter alia, for the payment of various expenses, and providing *301 further that petitioner "retire 1,442 shares of the 4,000 shares of stock outstanding on a basis of $25.00 per share, and that this amount of stock be called in, paid for, and cancelled on the records of the corporation. This action is taken as the first of a series of distributions in complete liquidation of the corporation, which is to be completed during 1941 and 1942". At a special meeting on December 6, 1940, petitioner's stockholders, by resolution, ratified and confirmed the action of the board of directors and further they adopted a resolution authorizing petitioner to grant to Pulaski County for a consideration of $1 an easement and right-of-way 80 feet in width for use as a public road through petitioner's property, because such public road would be "advantageous to the corporation". The petitioner's 1940 sale of 110.5 acres of its land was reported on its 1940 tax return as the sale of a capital asset for $49,727.70, which amount less cost and expenses of sale in the amounts of $27,011.60 and $4,972.76, respectively, was reported as a "long-term capital gain" of $17,743.34. That return stated that petitioner's kind of business was "Real Estate", but it also had the following *302 notation thereon: "Company not doing business, in liquidation and not subject to Declared Value Excess Profits Tax". On December 30, 1940, petitioner filed with the respondent, Form 966, a return of information, advising respondent that on November 1, 1940, petitioner had adopted a resolution or plan of liquidation. During the year ended June 30, 1940, the petitioner was engaged in carrying on or doing business, to-wit: the business of owning and selling farm land which was held for sale for profit and the business of renting for profit its unsold land. During its income-tax taxable year ended December 31, 1940, petitioner sold real estate acreage held by it primarily for sale to customers in the ordinary course of its business. Opinion Respondent determined: (1) That petitioner was engaged in carrying on or doing business during the year ended June 30, 1940, and therefore subject to the declared value excess-profits tax under section 600, I.R.C., as amended; (2) that the petitioner's sale of 110.5 acres of land in 1940 was made "to a customer in the ordinary course of your trade or business" and therefore did not result in a capital gain under section 117, I.R.C. *303 , as amended, and that the gain from the sale should be included in petitioner's excess-profits net income under section 711, I.R.C., as amended; (3) and that the deficiency in excess-profits tax was subject to a 25 per cent penalty for failure of petitioner to file an excess-profits tax return for 1940. Petitioner controverts the factual and legal aspects of respondent's determination, but agrees that if such determination is sustained then respondent's mathematical computations are correct. The pertinent provisions of the Internal Revenue Code and also of the Regulations are set forth in the margin. [1]
*304 While the first issue we have to determine is whether the petitioner was carrying on or doing business in the taxable year 1940, its "situation and activities must be considered in the entirety ( Edwards v. Chile Copper Co., 270 U.S. 452, 455, * * *; United States v. Hercules Mining Co., 9 Cir., 119 Fed. (2d) 288, 291 and we should look into the past as well as the present. Lyon Lumber Co. v. Harrison, Collector, 7 Cir., 113 Fed. (2d) 443, 446". United States v. Western Shore Lumber Co., 136 Fed. (2d) 628. The history of petitioner was, in part, as follows. During the period March 1911 up to the end of 1924, petitioner had acquired the 759 acre tract of farm land and made improvements thereon at a total cost of $91,929.15; had made gross sales amounting to $132,603.43 for lands which originally cost it $34,711.18; and had on hand at the close of 1924 lots and acreage having a cost basis of $57,217.97. In about 1925, after selling two lots in that year, and on account of complaints of prior purchasers of lots that they had paid too high prices therefor and also on account, apparently, of the advantage accruing to petitioner through *305 the reduction in state and county taxes on the platted land by its reconversion into acreage, petitioner decided not to sell lots or small acreage, but to hold its then remaining property for a profitable sale in one tract, if possible, so as to facilitate a liquidation, and in pursuance of such decision petitioner, in 1932, secured a court order reconverting six blocks of the subdivision into acreage, thus reducing petitioner's state and county taxes on the land so reconverted. In 1933 petitioner sold approximately six acres of its land to the United States Government for a total of $4,812.78. In 1940 petitioner sold to the City of Little Rock the 110.5 acres, profit on which is here involved. Thereafter, petitioner owned approximately 200 acres of the original tract of 759 acres acquired by it in 1911 and these 200 acres were distributed in liquidation to the stockholders after 1940. Although the petitioner made only four sales during the period from 1925 to the end of 1940, it is shown that in 1934 petitioner's president, owning two-thirds of its stock, went to Washington to secure the construction of a housing project on petitioner's land. It is also shown that during its periods *306 of inactivity in selling lands petitioner was holding its unsold land for sale at an advantageous price rather than selling it at what it considered a sacrifice and that throughout the years petitioner was renting various tracts of such unsold land for profit, pending ultimate sale thereof; receiving as rents up to and including 1940, an approximate amount in excess of $36,000. Considering the history of petitioner it was, in our opinion, "carrying on or doing business" for a part of the year ended June 30, 1940, within the meaning of section 1200, I.R.C., supra, and within the applicable regulations, supra, part of which regulations (43 (a)-5) having been held to be a reasonable and proper interpretation of the provisions of the statute in Magruder v. Washington, Baltimore & Annapolis Realty Corp., 316 U.S. 69, and the other parts of the regulations applicable to the situation here having been held to be a reasonable and proper interpretation of the provisions of the statute in Section Seven Corporation v. Anglim, 136 Fed. (2d) 155. The business petitioner was "carrying on" was the business for which it was organized, viz, the acquisition, *307 development, and resale of 759 acres of farm land for profit, and also the renting of such land, or parts thereof, for profit pending ultimate sale thereof. See United States v. Western Shore Lumber Co., supra; San Fernando Mission Land Co. v. Commissioner, 135 Fed. (2d) 547; and Section Seven Corporation v. Anglim, supra. The cases of Zonne v. Minneapolis Syndicate, et al., 220 U.S. 187; McCoach v. Minehill & S.H.R. Company, 228 U.S. 295; United States v. Emery, Bird, Thayer Realty Company, 237 U.S. 28; and Sears, et al. v. Hassett, 111 Fed. (2d) 961, relied on by petitioner are distinguished on their facts in that in each case the taxpayer had wholly parted with control and management of its property and its sole authority was to hold title subject to a long term lease and receive and distribute rentals; whereas, in the instant case petitioner retained full control, management, and authority over its properties and exercised its discretion in rejecting offers to purchase small tracts of acreage and in holding its property for a profitable sale in one tract, if possible, and in continuing *308 its pursuit of profits through renting various tracts of the land at various times through its entire existence. All the above cited cases, except Sears v. Hassett, were discussed and distinguished by the Court in Von Baumback v. Sargent Land Co., 242 U.S. 503, wherein the taxpayer corporation, in addition to giving their lessees, for a period of 50 years, exclusive possession, control, and management over certain mining properties for which the taxpayer received rents and royalties, engaged in selling certain real estate and stumpage, and leased other lands. In holding that the doing of all those things constituted doing business in a corporate capacity, the Court said that "the comprehensive term 'business' included * * * that which occupies the time, attention and labor of men for the purpose of a livelihood or profit"; that "no particular amount of business" is necessary and further that, "It is evident, from what this court has said in dealing with former cases, that the decision in each instance must depend upon the particular facts before the court". The McCoach and Emery cases were also distinguished in Section Seven Corporation v. Anglim, supra. *309 Even if, as contended by the petitioner, it was in process of liquidation when the sale in question was made, that is to say, endeavoring to sell all its property so as to wind up its corporate affairs, such activity was in keeping with one of its original business purposes of selling the 759 acre tract of land for profit, and constituted doing business within the rationale of Magruder v. Washington, Baltimore & Annapolis Realty Corp., supra, wherein it was held that even though the taxpayer was organized for the purpose of liquidating property acquired through foreclosure and for the benefit of creditors, it was "carrying on or doing business" within the meaning of the applicable statute and regulations. See also United States v. Western Shore Lumber Co., supra; Commissioner v. Boeing, 106 Fed. (2d) 305; and Ehrman v. Commissioner, 120 Fed. (2d) 607; and authorities cited therein. The record fails to show the date that petitioner made its sale of 110.5 acres in 1940, but we may not assume that such sale was made subsequent to June 30, 1940 as the respondent determined it not to be. In any event, petitioner was holding its property *310 for sale for profit prior to that date and received rentals in the amount of $1,049.78 for 1939 and $1,198.68 for 1940, so that it is clear in any event that petitioner was engaged in the business of renting land for profit during the year ended June 30, 1940. As to the first issue, and on authority of the principles announced in the above cited cases, we sustain the respondent's determination that petitioner was "carrying on or doing business" or, more specifically stated, was carrying on its real estate business during the year ended June 30, 1940 within the meaning of section 1200, I.R.C., supra, and, accordingly, we sustain respondent's further determination that petitioner is subject to the declared excess profits tax under section 600, I.R.C., supra. The second issue is whether petitioner's sale of 110.5 acres of land in 1940 was the sale of a capital asset resulting in a long-term capital gain excluded from excessprofits net income under section 711 (a) (1) (B), I.R.C., supra, as contended by petitioner, or, as determined by respondent, was a sale of "property held by the taxpayer primarily for sale to *311 customers in the ordinary course of his trade or business" under section 117 (a) (1), I.R.C., supra, resulting in ordinary income subject to excess profits tax under section 711, I.R.C., supra. There is no issue as to the amount of gain realized on the sale. Since we have held that petitioner was carrying on real estate business during 1940 and since the facts herein show that petitioner was holding its acreage "primarily for sale", then certainly the petitioner's sale of 110.5 acres in 1940 was to "customers in the ordinary course" of that business. Ehrman v. Commissioner, 120 Fed. (2d) 607, 610, Jacobs S. Gruver, 1 T.C. 1204. Neither the lapse of several years between the petitioner's prior sales of real estate and the sale in question, nor the petitioner's comparative inactivity for several years because of its desire to make sales at an advantageous price served in any way to convert petitioner's real property into an investment held as a capital asset. Cf. Jacob S. Gruver, supra; Queensboro Corporation, 46 B.T.A. 1216; Julius Goodman, et al, 40 B.T.A. 22; Charles H. Black, Sr., 45 B.T.A. 204; *312 and Joe B. Fortson, et al, 47 B.T.A. 158. The facts are that petitioner originally acquired its real property for resale, at a profit, to customers as they could be found in the ordinary course of its business and that such original purpose continued throughout all the subsequent years, although either an adverse market or its own desire to sell the property in one tract resulted in comparatively few sales during the period of years preceding the taxable year 1940. The cases cited by petitioner, on this issue, viz., Harriss v. Commissioner, 143 Fed. (2d) 279; Phipps, et al. v. Commissioner, 54 Fed. (2d) 469; and 512 West Fifty-sixth Street Corp. v. Commissioner, 151 Fed. (2d) 942, are so clearly distinguishable on the facts as to need no specific discussion. In our opinion, the 110.5 acre tract sold in 1940 was a sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of * * * [its] business" within the meaning of section 117 (a) (1), I.R.C., supra, and the undisputed amount of the gain realized therefrom constituted ordinary income subject to excess-profits tax under *313 section 711, I.R.C., supra, as determined by respondent. Since petitioner failed to file an excess profits tax return for 1940, the respondent is sustained in his determination of a 25 per cent penalty. Decision will be entered for the respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (I.R.C. as amended by section 115 (b) (c) Revenue Act of 1941.) (a) Definitions. - As used in this chapter. - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), * * * * *
(4) Long-Term Capital Gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such gain is taken into account in computing net income; SEC. 710. IMPOSITION OF TAX. (Excess-Profits Tax) (I.R.C., as amended by section 201, 2d Revenue Act 1940) (a) Imposition. - There shall be levied, collected, and paid, for each taxable year beginning after December 31, 1939, on the adjusted excess profits net income, as defined in subsection (b), of every corporation (except a corporation exempt under section 727) a tax as follows: * * * * *
SEC. 711. EXCESS PROFITS NET INCOME. [I.R.C., as amended by section 201, 2d Revenue Act of 1940] (a) Taxable Years Beginning After December 31, 1939. - The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13(a) (2), for such year except that the following adjustments shall be made: (1) Excess Profits Credit Computed Under Income Credit. - If the excess profits credit is computed under section 713, the adjustment shall be as follows: * * * * *
(B) Long-Term Gains and Losses. - There shall be excluded long-term capital gains and losses. * * *; SEC. 600. RATE OF TAX. [Declared Value Excess-Profits Tax] [I.R.C., as amended by section 204, 1st Revenue Act of 1940 and section 506 (a), 2d Revenue Act of 1940] (a) General Rule. - If any corporation is taxable under section 1200 with respect to any year ending June 30, there shall be imposed upon its net income for the income-tax taxable year ending after the close of such year, a declared value excess-profits tax equal to the sum of the following: * * *
SEC. 1200. TAX. (Capital Stock Tax) (a) Domestic Corporations. - For each year ending June 30, beginning with the year ending June 30, 1939, there shall be imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock. REGULATIONS 64: Art. 42. Doing business. - The term "business" is very comprehensive and embraces whatever occupies the time, attention, or labor of men for profit. Accordingly, regardless of the nature of its activities, any corporation organized for profit and carrying out the purpose of its organization is doing business within the meaning of the Act. Similarly, even if not organized for profit, any corporation which engages in activities ordinarily carried on for profit is doing business. It is immaterial whether the activities result in a profit or a loss, or whether the corporation has been successful in its enterprise, or that because of unfavorable business conditions, no operations are carried on for a particular period. No particular amount of business need be done, nor is it necessary that the business be continuous throughout the taxable year. The case is exceptional in which the activities of a corporation organized for profits do not amount to doing business within the meaning of the Act. Such a case is generally limited to one in which the corporation is not pursuing the ends for which organized, i.e., profit. Art. 43. Illustrations. - (a) General. - In general "doing business" includes any activities of a corporation whether it engages in - (1) buying, selling, manufacturing, developing, financing, speculating, or otherwise dealing in or managing, property of any description; * * *
(3) leasing or managing properties, collecting rents or royalties; * * *
(5) the orderly liquidation of property by negotiating sales from time to time as opportunity and judgment dictate and distribution of the proceeds as liquidation is effected - for example, the liquidation of an estate, or of properties taken over from another corporation, or of the shareholders' fractional interests in particular property; * * *
(b) Exceptions. - Ordinarily the exceptions to "doing business" are restricted to limited activities of a corporation. For example - (1) A corporation is not subject to the tax if its corporate powers are limited to the mere owning and holding of property and the distribution of its avails, or, although incorporated for the purpose of doing business, if it has retired from the business for which it was organized and has reduced its activities to the mere ownership and holding of property, the distribution of its avails, and doing only such acts as are necessary to the maintenance of its corporate existence and the private management of its purely internal affairs. However, a corporation which has retired from its principal business is subject to the tax if, nevertheless, it engages in other business activities or maintains its organization for the purpose of continued effort in the pursuit of profit or gain. * * *
(3) A corporation will not be regarded as "doing business" if it had no activities during the entire taxable year, because it has - (a) become dormant; or (b) completed its business, as, for example, where a real estate subdivision has been developed, sold and reduced to cash; or (c) abandoned its business, as, for example, where prospective oil properties are proven worthless.↩